NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1387-14T3
A-1388-14T3
A-1389-14T3
A-1390-14T3

ABIGAIL GINSBERG, an infant,[1]
by her mother TAMAR GINSBERG,
as Guardian ad litem; TAMAR
GINSBERG, Individually; and
ARI GINSBERG, Individually,

    Plaintiffs-Respondents,

v.

QUEST DIAGNOSTICS, INC.,

    Defendant-Appellant,

and

ANDREW RUBENSTEIN, M.D.;
HACKENSACK UNIVERSITY MEDICAL
CENTER; HACKENSACK UNIVERSITY
MEDICAL CENTER DEPARTMENT OF
PEDIATRICS GENETICS SERVICE; and
JUDITH DURCAN, MS,

    Defendants-Respondents,

and

```
┌─────────────────────────────┐
│   APPROVED FOR PUBLICATION   │
│                             │
│       June 18, 2015         │
│                             │
│     APPELLATE DIVISION      │
└─────────────────────────────┘
```

---

[1] Abigail Ginsberg passed away in March 2011.  The appendices contain a letter from plaintiffs' counsel indicating that Tamar Ginsberg was subsequently appointed Administrator of the child's Estate, but we have not been furnished with a copy of a pleading with a corresponding amended caption substituting the Estate as a co-plaintiff.

QUEST DIAGNOSTICS, INCORPORATED,

     Third-Party Plaintiff,

v.

THE MOUNT SINAI MEDICAL CENTER, INC.,

     Third-Party Defendant.

_____

ABIGAIL GINSBERG, an infant, by her mother TAMAR GINSBERG as Guardian ad litem; TAMAR GINSBERG, Individually; and ARI GINSBERG, Individually,

     Plaintiffs-Respondents,

v.

QUEST DIAGNOSTICS, INC., and ANDREW RUBENSTEIN, M.D.,

     Defendants-Respondents,

and

HACKENSACK UNIVERSITY MEDICAL CENTER; HACKENSACK UNIVERSITY MEDICAL CENTER DEPARTMENT OF PEDIATRICS GENETICS SERVICE; and JUDITH DURCAN, MS,

     Defendants-Appellants,

and

QUEST DIAGNOSTICS, INCORPORATED,

     Third-Party Plaintiff,

v.

THE MOUNT SINAI MEDICAL CENTER,
INC.,

     Third-Party Defendant.

_____

ABIGAIL GINSBERG, an infant,
by her mother TAMAR GINSBERG,
as Guardian ad litem; TAMAR
GINSBERG, Individually; and
ARI GINSBERG, Individually,

     Plaintiffs-Respondents,

v.

QUEST DIAGNOSTICS, INC.;
HACKENSACK UNIVERSITY MEDICAL
CENTER; HACKENSACK UNIVERSITY
MEDICAL CENTER DEPARTMENT OF
PEDIATRICS GENETICS SERVICES;
and JUDITH DURCAN, MS,

     Defendants-Respondents,

and

ANDREW RUBENSTEIN, M.D.,

     Defendant-Appellant,

and

QUEST DIAGNOSTICS, INCORPORATED,

     Third-Party Plaintiff,

v.

THE MOUNT SINAI MEDICAL CENTER,
INC.,

     Third-Party Defendant.

_____

ABIGAIL GINSBERG, an infant,
by her mother TAMAR GINSBERG,
as Guardian ad litem; TAMAR
GINSBERG, Individually; and
ARI GINSBERG, Individually,

    Plaintiffs-Respondents,

v.

QUEST DIAGNOSTICS, INC.;
ANDREW RUBENSTEIN, M.D.;
HACKENSACK UNIVERSITY MEDICAL
CENTER; HACKENSACK UNIVERSITY
MEDICAL CENTER DEPARTMENT OF
PEDIATRICS GENETICS SERVICE;
and JUDITH DURCAN, MS,

    Defendants-Respondents,

and

QUEST DIAGNOSTICS, INCORPORATED,

    Third-Party Plaintiff-
    Respondent,

v.

THE MOUNT SINAI MEDICAL CENTER,
INC.,

    Third-Party Defendant-
    Appellant.

_____

        Argued March 16, 2015  -  Decided June 18, 2015

        Before Judges Sabatino, Simonelli, and Guadagno.

        On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-1169-10.

Thomas J. Cafferty argued the cause for appellant Quest Diagnostics in 1387-14 and as respondent in 1388-14 and 1389-14 (Gibbons P.C., attorneys; Mr. Cafferty, Mark S. Sidoti, Nomi I. Lowy, and Lauren James-Weir, of counsel and on the brief).

Michael R. Ricciardulli argued the cause for appellant Andrew Rubenstein, M.D. in 1389-14 and as respondent in 1387-14, 1388-14, and 1390-14 (Ruprecht Hart Weeks & Ricciardulli, LLP, attorneys; Mr. Ricciardulli and Daniel B. Devinney, on the brief).

Ellen L. Casagrand argued the cause for appellants Hackensack University Medical Center, Hackensack University Medical Center Department of Pediatrics Genetics Service, and Judith Durcan, MS, in 1388-14 and as respondents in 1387-14, 1389-14, and 1390-14 (Buckley Theroux Kline & Petraske, LLC, attorneys; Ms. Casagrand, on the brief).

Benjamin H. Haftel argued the cause for appellant The Mount Sinai Medical Center in 1390-14 (Vaslas Lepowsky Hauss & Danke LLP, attorneys; Mr. Haftel, on the brief).

Victoria E. Phillips argued the cause for respondents Ginsberg in 1387-14, 1388-14, 1389-14, and 1390-14 (Phillips & Paolicelli, LLP, attorneys; Ms. Phillips and Daniel J. Woodard, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

These four interlocutory appeals[2] stem from a lawsuit involving factual allegations and parties that straddle the

---

[2] We consolidate the appeals, which were calendared back-to-back, for purposes of this opinion.

A-1387-14T3

states of New York and New Jersey. The core question presented to us is whether the laws of New York, the laws of New Jersey, or some combination of the laws of both states, govern the claims, third-party claims, cross-claims, and defenses asserted in the litigation.

Plaintiffs, on behalf of themselves and their now-deceased daughter, have asserted claims of wrongful birth, wrongful life, medical malpractice, negligent hiring, and negligence in connection with their daughter's birth in 2008 and her subsequent diagnosis of Tay-Sachs disease, a genetically-inherited and fatal condition. In essence, plaintiffs contend that defendants each erred in the health care, genetic testing services, or genetic counseling they provided before the couple conceived their daughter upon a mistaken belief that the father was not a Tay-Sachs carrier.

Plaintiffs are currently New Jersey residents who previously resided in New York. They have sued a New Jersey licensed physician, a New Jersey hospital and one of its employees (collectively "the New Jersey health care defendants"), and a medical testing company. The latter defendant has its principal place of business in New Jersey, but it received the father's blood specimen in New York and issued its report on that sample in New York. The medical testing

6

company has brought a third-party complaint against a New York hospital that actually performed the testing. Numerous cross-claims for indemnification and contribution have been interposed between and among the defendants and the third-party defendant.

The trial court determined that New Jersey law, which differs significantly from New York law on certain facets of this case, governed all of the issues in this litigation. We granted motions for leave to appeal by the defendants and the third-party defendant, who all seek to overturn that threshold determination and to have New York law instead applied to the claims asserted against them.

Applying choice-of-law principles set forth in P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132 (2008), the Restatement (Second) of Conflicts of Laws (1971) ("the Restatement"), and other case law, we conclude that New York law applies to the claims respectively asserted against the testing company and the New York hospital, whose allegedly wrongful and injurious conduct occurred in New York. We further conclude that New Jersey law applies to plaintiffs' claims against the New Jersey health care defendants, whose allegedly wrongful and injurious conduct occurred in this state.

Because of the insufficiency of the present record as to the actual contractual arrangements for the testing of the

father's blood sample by the New York hospital, we decline to resolve which state's law governs the contractual indemnification claims, if any, asserted against that third-party defendant. We also decline at this juncture to resolve which state's law governs the various cross-claims that have been, or may be, asserted by and among the parties who have been sued. We also do not reach the discrete choice-of-law issues concerning the statutes of limitations, which were not explicitly addressed in the trial court.

Based on this overall disposition, we reverse in part the trial court's determination that the law of New Jersey must apply to the conduct of all of the defendants and of the third-party defendant. We specifically reject the trial court's premise — a premise which is advocated by the New Jersey health care defendants who prefer in this case to have New York law apply to them — that the law of only one state can be applied in this litigation.

As a final caveat, we note that, in rare and extraordinary circumstances, a court's choice-of-law dispositions, in a case such as this one with multi-state dimensions, can be reexamined at the time of trial. The propriety of such a rare potential reexamination here will depend upon which parties remain in the case at that point, as well as the feasibility and fairness of

trying the remaining claims and cross-claims under the laws of multiple states.

I.

We derive the following pertinent facts and chronology of events from the record, which largely consists of deposition transcripts, interrogatory answers, and a few other documents. We do so mindful that discovery in this case has not been completed and that the factual allegations have yet to be adjudicated.[3]

### The Parties' Relationship, the Mother's Genetic Testing in New Jersey, and the Father's Genetic Testing in New York

The parents of the now-deceased child, plaintiffs Tamar Ginsberg ("Tamar")[4] and Ari Ginsberg ("Ari"), met and began dating in October 2004. At that time, Ari resided in Far Rockaway, New York, and Tamar then resided in Teaneck, New Jersey.

The couple were concerned about the possibility of any child of theirs having a genetic condition associated with their Ashkenazi Jewish heritage. They were particularly concerned

---

[3] Our orders granting leave to appeal permitted factual discovery to continue, and we were advised at oral argument that such additional discovery has, in fact, been pursued. Hence, the factual record is still being developed in certain respects.

[4] For ease of reference, we shall use the first names of the parents and their deceased child, intending no disrespect.

about the risk of Tay-Sachs disease, because Tamar knew her sister was a carrier for that condition.

Tay-Sachs disease is "a genetically-inherited, incurable condition that first appears in an infant at approximately six months of age, progressively causing mental retardation, blindness, seizures, and death between the ages of two and four years." Geler v. Akawie, 358 N.J. Super. 437, 445 (App. Div.), certif. denied, 177 N.J. 223 (2003). The condition is a "genetic disorder caused by an absence of the enzyme hexosaminidase A and consequent accumulation of the lipid GM2 ganglioside in nerve cells of the brain." 5 J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine, T-29 (2009). Typically, "[n]eural damage [from Tay-Sachs] begins early in fetal development, with the first signs and symptoms becoming apparent when the infant is about six months old." Ibid.

Because of concerns about giving birth to a child with Tay-Sachs, the couple sought genetic counseling and testing. They claim, however, that they would have married each other regardless of the genetic test results.

On December 28, 2004, Ari visited the office of his primary care physician, Dr. Israel Samson, in Cedarhurst, New York, and requested a blood test to determine if he was a carrier of Tay-Sachs. Ari also asked Dr. Samson about a chromosomal

translocation test, given that his brother has Down Syndrome, and that his mother and sister both have a translocation. Dr. Samson allegedly stated that he would not perform such translocation testing.

Dr. Samson was educated and trained as a physician in New York. He was licensed only in New York, and he practiced medicine exclusively in that state.

Dr. Samson drew Ari's blood in New York at the time of his December 2004 visit. Dr. Samson sent the sample to defendant Quest Diagnostics, Inc. ("Quest") for testing, since Ari's health insurance policy apparently required that Quest be used for that purpose. Quest's corporate headquarters and principal place of business are located in Madison, New Jersey, although Quest conducts business in New York and in other states.

By his own admission, Dr. Samson did not frequently request Tay-Sachs testing. Therefore, he directed his secretary to call Quest regarding how to place the order for testing. Dr. Samson testified at his deposition that during that phone call, Quest identified the applicable code to place on the test requisition form.

Upon picking up Ari's blood sample from Dr. Samson's office, Quest delivered the specimen to its office in Syosset, New York. Thereafter, Quest sent the sample to third-party

11

defendant, Mt. Sinai Medical Center ("Mt. Sinai") for testing, pursuant to an agreement between the two entities.[5] Mt. Sinai is located in New York, and it tested Ari's blood in New York.

Dr. Samson testified that he requested Quest to conduct testing for whether Ari was a carrier of Tay-Sachs. However, testing was done instead for Sandhoff disease, which can be regarded as a specific form of Tay-Sachs.[6]

Mt. Sinai determined that Ari was not a carrier for Sandhoff disease. Quest reported that information to Dr. Samson, who explained the findings to Ari on January 10, 2005. Ari recalled that Dr. Samson left a voicemail on his cell phone, stating that he was not a carrier of Tay-Sachs. That information turned out to be incorrect, however, as a test performed four years later, after Abigail's diagnosis, revealed that Ari is indeed a carrier for Tay-Sachs.

---

[5] The only written agreement between Quest and Mt. Sinai referenced in the depositions was an agreement effective April 11, 2005, a date after Ari's testing. A copy of that agreement is not part of the appellate record. We were advised by counsel at oral argument that apparently no written agreement was in force between Quest and Mt. Sinai at the time Ari's specimen was tested.

[6] Specifically, Sandhoff disease involves a defect in both the enzymes hexosaminidase A and B, whereas Tay-Sachs involves a deficiency in only hexosaminidase A. See 5 Schmidt, Attorneys' Dictionary of Medicine, supra, S-24 and T-29.

Ari did not receive a written copy of his test results in 2005, and he never spoke with anyone at Quest or at Mt. Sinai. Ari called Tamar at her home in New Jersey after speaking with Dr. Samson, and he told her that he had tested negative for Tay-Sachs.

Shortly thereafter, in February 2005, Tamar visited defendant Andrew Rubenstein, M.D., a gynecologist, at his office in Saddle River, New Jersey. She consulted Dr. Rubenstein in order to be tested for genetic diseases related to her Jewish heritage. She also sought his advice in planning her menstrual periods in anticipation of her marriage to Ari, as is common in the Orthodox Jewish community. Ari himself never visited Dr. Rubenstein's office.

Tamar advised Dr. Rubenstein that Ari already had been tested for Tay-Sachs, and that he had been found negative for that condition. She pointed out that Ari's brother had Down Syndrome, and that his mother was a carrier for trisomy 21, which is another name for that condition. She also told Dr. Rubenstein about her own family members who were carriers of Tay-Sachs and cystic fibrosis.

Dr. Rubenstein stated in his interrogatory answers that he discussed with Tamar the risk of Tay-Sachs if both she and Ari

were carriers. Tamar, however, denied having any such discussion with him.

It is apparently undisputed that Dr. Rubenstein asked Tamar for a copy of Ari's Tay-Sachs test results, but Tamar did not provide a copy to him. She did not recall at her deposition ever speaking to Ari about Dr. Rubenstein's request. Ari likewise had no recollection at his deposition of her asking him for a copy of his results. According to Tamar, she did not provide Dr. Rubenstein with Ari's test results because she had trusted the results Ari received from Dr. Samson.

Tamar's blood was drawn at Dr. Rubenstein's office in New Jersey. Her sample was tested, coincidentally by Quest, in New Jersey for the range of diseases customarily associated with Ashkenazi Jewish heritage. The test results accurately showed that Tamar was a carrier of Tay-Sachs.

Dr. Rubenstein informed Tamar of her test results, and mailed a copy to her. He also recommended that Ari undergo chromosomal analysis, due to his own family history of Down Syndrome.

Tamar advised Ari of Dr. Rubenstein's recommendation, and Ari underwent the necessary blood work at a New York laboratory in Cedarhurst. Testing of Ari's blood sample by Quest in New York revealed that Ari had a balanced "Robertsonian

14

translocation." Dr. Rubenstein discussed the test results with a geneticist. On March 22, 2005, Dr. Rubenstein spoke with Tamar by telephone and advised her of those results. He also referred the couple to defendant Hackensack University Medical Center ("HUMC") for genetic counseling.

### The Genetic Counseling at HUMC in New Jersey

On May 6, 2005, Ari and Tamar met at HUMC with defendant Judith Durcan, MS, for genetic counseling relating to Ari's chromosome translocation. At that time, Ari considered Tay-Sachs a "nonissue" because he believed he had tested negative for the condition. The couple met with Durcan on just one occasion, and no tests were performed.

By letter to Dr. Rubenstein dated May 6, 2005, on which Ari and Tamar were copied, Durcan summarized her discussion with the couple. Tamar received the letter at her parents' New Jersey home in Teaneck, but Ari did not recall seeing it before this litigation.

With respect to Tay-Sachs, Durcan noted that Tamar is a Tay-Sachs carrier, but that Ari "stated that his screening test results for Tay[-]Sachs (TS) [we]re negative." Durcan further noted that she did not have Ari's results available for review at the time of their meeting, but offered to review those results. Durcan also indicated that she had discussed with the

couple the autosomal recessive inheritance, the carrier frequency, and the features of Tay-Sachs. She also discussed the "different testing modalities for [Tay-Sachs] currently available and suggested that Ari make sure that he had biochemical (enzyme) analysis for [Tay-Sachs], as this type of testing can rule-out most carriers of [Tay-Sachs]."

Tamar admitted discussing with Durcan the couple's Tay-Sachs test results, and that Durcan offered to review those results, although Ari could not recall that part of the conversation. The couple did not provide Durcan with Ari's results, choosing instead to rely on the information they had previously received. The couple explained at their depositions that they had confidence in the test results that Ari had orally received from Dr. Samson.

### The Parties' Marriage, Tamar's Move to New York, and Abigail's Birth in New York

In June 2005, Tamar and Ari were married in New York. After the marriage, Tamar relocated from New Jersey and the couple resided together in Far Rockaway, New York.

A few months after the marriage, Tamar visited Dr. Rubenstein on October 28, 2005 for a pap smear and a prescription for birth control pills. Dr. Rubenstein also discussed with Tamar the HUMC/Durcan genetic consultation results. He recommended that the couple attempt to conceive

16

through in vitro fertilization, with pre-implantation genetic testing of the embryos, due to Ari's chromosomal translocation. However, Tamar did not want to pursue an in vitro procedure, since she perceived there was a low risk of Down Syndrome.

Tamar never returned to Dr. Rubenstein, as she switched her care to a New York-based ob/gyn, Dr. Terry Rifkin. Dr. Rubenstein did speak with Tamar again in October 2005, regarding her genetic consultation. He also sent her a reminder card in August 2006 for a follow-up visit that never occurred.

In June 2006, Tamar visited Dr. Rifkin in New York. At that time, she and Ari had plans to conceive a child naturally, with the intent of terminating the pregnancy if prenatal testing revealed that the child had Down Syndrome. Tamar wished to discuss with Dr. Rifkin the strict guidelines under Jewish law for terminating a pregnancy.[7] At her visit, Tamar advised Dr. Rifkin that Ari had tested negative for Tay-Sachs, although she had tested positive. Dr. Rifkin did not request a copy of Ari's results, and the couple did not provide those results to him

---

[7] Ari is a rabbi, and he testified at his deposition about his understanding of Jewish law on abortion, as did Tamar. A New York statute provides that abortions are permitted in the state up to twenty-four weeks into a pregnancy, with additional time afforded if the abortion is necessary to preserve the woman's life. See N.Y. Penal Law § 125.05 (Consol. 2015).

although Tamar believed Dr. Rifkin may have taken her blood and ordered his own testing of her.

In June 2007, Tamar became pregnant. She asserts that she conceived in New Jersey, and that she learned of the pregnancy the next month while she was in New Jersey at her parents' home in Teaneck.

Tamar received prenatal care from Dr. Rifkin in New York. During the pregnancy, she underwent a chorionic villi sampling ("CVS") at a hospital in New York, which revealed that the fetus was a female who had a balanced chromosomal translocation, but did not have Down Syndrome.

Tamar and Ari were required to meet with a genetic counselor at the hospital in connection with the CVS. Tamar recalled that they discussed Tay-Sachs with the counselor, and the fact that Ari had tested negative as a carrier of that disease. Tamar did not recall the counselor asking for a copy of Ari's test results.

Abigail was born in March 2008, at North Shore University Hospital in New York. Immediately after their release from the hospital, Tamar and Abigail visited with Tamar's parents in New Jersey. Thereafter, Tamar, Ari, and Abigail resided in New York, along with a son who was later born in November 2010.

Abigail received pediatric care from Dr. Hylton Lightman, in New York.

### Abigail's Diagnosis with Tay-Sachs, her Treatment, and the Family's Relocation to New Jersey

In October 2008, Abigail was diagnosed with Tay-Sachs by her physicians in New York. The diagnosis was made after Tamar had noticed problems with Abigail's eyes.

Around the time of Abigail's diagnosis, Ari went to Dr. Samson's office to obtain a copy of his blood test results from 2005. He confronted Dr. Samson when he saw that he had been tested for Sandhoff disease, as opposed to Tay-Sachs. Ari initially believed Dr. Samson had ordered the wrong test. Dr. Samson defended his choice of test, stating his belief that the Sandhoff test results meant Ari was negative for Tay-Sachs.

Dr. Lightman subsequently ordered further testing of Ari. Two types of Tay-Sachs testing were then performed by Labcorp. In those results, Ari tested positive as a Tay-Sachs carrier. Dr. Lightman did not criticize Dr. Samson, but stated that he himself typically ordered a chromosomal mutation analysis, as opposed to the Sandhoff tests that Dr. Samson had requested.

Ari acknowledged at his deposition that he initially was angry with Dr. Samson. However, after consulting with a geneticist in New York, Ari believed that his Sandhoff test results should have also revealed if he were a carrier for Tay-

A-1387-14T3

Sachs, and it was not possible for his two test results to contradict each other without there being a flaw in the original testing.[8]  Therefore, Ari and Tamar maintain that they do not believe that Dr. Samson had done anything wrong.

As to Abigail's medical care, she was treated primarily after her Tay-Sachs diagnosis by physicians and health care providers in New York, but also by some in New Jersey, particularly after the family moved to this state.  Tamar sought psychological treatment in New Jersey in connection with Abigail's illness.  Ari, meanwhile, sought psychological treatment for himself in New York.

In December 2009, plaintiffs moved to Bergenfield, New Jersey. They claim to have done so in order to be closer to their family.  Two months later they filed this lawsuit. Abigail died at her home in New Jersey in March 2011.

The Claims in This Litigation

Plaintiffs, who continue to be New Jersey residents, filed their complaint in the Law Division against Quest, Dr. Rubenstein, HUMC, and Durcan.  Their complaint asserts claims of wrongful birth, medical malpractice, and negligent hiring against all defendants.  They also assert a more generalized

---

[8]  Because discovery has not yet closed, we do not know if plaintiffs have retained an expert to support this contention.

claim of negligence only against Quest. Tamar individually asserts a claim of "wrongful life"[9] on behalf of Abigail against all of the defendants.

Notably, plaintiffs chose not to assert any claims against Dr. Samson. Nor did they sue any of the other health care professionals that treated or counseled them or treated Abigail.

HUMC, Durcan, and Dr. Rubenstein each denied liability and asserted cross-claims for contribution and indemnification. Quest likewise denied liability, and asserted as one of its defenses that New York law applied to all claims filed against it. In particular, Quest asserted that New York law would "operate to bar some or all of the claims and/or damages set forth in the [c]omplaint." Quest also filed cross-claims for contribution and indemnification.

In addition, Quest filed a third-party complaint against Mt. Sinai, asserting claims for indemnity, contribution, and breach of contract, which Mt. Sinai answered, denying liability.[10] Mt. Sinai has asserted cross-claims for common-law indemnification and contribution from all of the defendants.

_____

[9] See, Part II(A), infra, for a discussion of the elements of what is termed a "wrongful life" claim under New Jersey law, a cause of action which is not recognized under New York law.

[10] Plaintiffs did not move to amend their complaint to name Mt. Sinai as direct defendant. It is not clear from the record
(continued)

Shortly after the pleadings were completed, Quest, HUMC, and Durcan moved for the application of New York law, to dismiss plaintiffs' claims under Rule 4:6-2(e), and for summary judgment; Dr. Rubenstein moved for the application of New York law; Mt. Sinai moved for the application of New York law and for summary judgment; and plaintiffs moved to compel discovery.

On August 28, 2013, the judge assigned at that time to this case ruled that questions of fact precluded summary judgment as to HUMC and Durcan. That judge also authorized additional discovery on both the choice-of-law issues and as to the merits of the case. These dispositions are not challenged in the present appeals.

Following additional discovery, defendants and Mt. Sinai again moved for the application of New York law. After a different Law Division judge ("the motion judge") heard argument on those motions, the judge issued an oral opinion and corresponding orders on September 26, 2014. The judge denied the motions, and held that New Jersey law applies to all issues and parties in this case.

_____

(continued)
supplied to us whether any of the co-defendants amended their pleadings to assert cross-claims against Mt. Sinai.

In his oral decision on the choice-of-law question, the motion judge recognized that the factual allegations and parties in this case straddle both the states of New York and New Jersey. The judge also recognized that New York law and New Jersey law differ in material respects on various aspects of this case.[11]

The judge invoked the "most significant relationship" principles expressed in Sections 6, 145, and 146 of the Restatement as adopted by our Supreme Court in P.V., supra, 197 N.J. at 136. The judge recognized that, in a case such as this one with claims of tortious conduct, the law recognizes a presumption in favor of applying the law of the state where the injury occurred. See P.V., supra, 197 N.J. at 136; Restatement, supra, §§ 6 and 145. However, as the judge further recognized, "[i]f another state has a more significant relationship to the parties or issues, the presumption [of the law of the former state] will be overcome. If not, [the presumption] will govern." P.V., supra, 197 N.J. at 136 (emphasis added).

The judge rejected the possibility that New Jersey law could apply to claims against certain parties in this case,

---

[11] See discussion of some of those differences in Part II(A), infra.

while New York law could apply to claims against the other parties. In essence, the judge perceived that his sole options were to either apply New Jersey law or New York law to the entire case. Given that perceived constraint, the judge found that New Jersey, rather than New York, had the overall "most significant relationship" to the parties and claims in this litigation.

In the course of his analysis, the judge underscored the fact that Dr. Rubenstein, HUMC, and Durcan are all domiciled in New Jersey and have their principal places of business in this State, and that Dr. Rubenstein is licensed as a physician in this State. The judge also found that the conduct of those New Jersey health care defendants, to the extent they may have caused or contributed to plaintiffs' alleged injuries, occurred in this State, which he regarded as the center of the relationship between plaintiffs and those parties.

The judge perceived that Tamar's alleged loss of reproductive choice occurred in New Jersey, where she had consulted the New Jersey defendants, rather than in New York. The judge found that the public policy of New Jersey favors compensating innocent patients for injuries caused by licensed health care providers in this State, and that such New Jersey

providers "should reasonably expect to be subject to New Jersey law."

The judge acknowledged that the choice-of-law analysis as to Quest and Mt. Sinai was "[m]ore difficult" because, as to those parties, New York was the State in which their relevant alleged conduct occurred, and the State where the other parties' relationships to them was centered. Even so, the judge concluded that a "qualitative analysis" of the whole case, considering the "entire pot" of claims involved, required the law of New Jersey to apply, and that the Restatement's presumption in favor of applying the forum state's law was not overcome.

The Present Interlocutory Appeals

We thereafter granted leave to Quest, HUMC, Durcan, Dr. Rubenstein, and Mt. Sinai to appeal the trial court's choice-of-law ruling. All of those parties seek to have New York law, rather than New Jersey law, apply.

Quest and Mt. Sinai differ from the other appellants, however, in that they submit that the court may take a defendant-by-defendant approach to choice of law, allowing the court to apply the law of more than one state to the various defendants. The other appellants insist that the law of only one state can apply here and that the state is New York.

Plaintiffs, meanwhile, agree that the trial court correctly applied New Jersey law to the entire case. They stress the many points of nexus to New Jersey within the factual chronology: Tamar's status as a New Jersey resident when the genetic testing was performed; the family's ultimate New Jersey domicile after Abigail was born and suit was filed; Quest's principal place of business in New Jersey; and this State's public policies in regulating professionals and businesses who conduct activities here and in assuring fair compensation to New Jersey tort claimants.

## II.

### A.

One of the most important questions a court will often face in adjudicating a case like this, involving parties and conduct in multiple states, is to identify which state's law applies to the parties and the various claims asserted. Inevitably, states in our federal system will adopt laws — whether by statute, regulation, or case law — that will diverge from the laws of other states. When those state laws clash, courts must necessarily ascertain which state's law governs the case or the particular issues at hand.

The choice-of-law determination ideally should be made as early in a case as possible. <u>Bailey v. Wyeth, Inc.</u>, 422 <u>N.J.</u>

Super. 343, 350 (Law Div. 2008), aff'd on other grounds, 422 N.J. Super. 360 (App. Div. 2011), certif. denied, 211 N.J. 274 (2012). We apply a de novo standard of appellate review to such rulings. Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 418 (App. Div. 2011), certif. denied, 210 N.J. 478 (2012).

Multi-faceted choice-of-law principles, such as those expressed in the Restatement, have been developed to assist judges in resolving these conflicts. The choice-of-law principles of the forum state control the analysis. Fu v. Fu, 160 N.J. 108, 117 (1999). In applying such principles, the first thing a court must determine is whether the laws of the particular states having a nexus to a case actually diverge. P.V., supra, 197 N.J. at 143.

Here, such divergence between New Jersey law and New York law is indisputably present. Although we need not exhaustively detail all of the material points of difference, a few are worth mentioning by illustration.

For example, New Jersey recognizes a cause of action for what our state describes as "wrongful birth," which may be asserted by parents who claim that they were "deprived of the option of making a meaningful decision as to whether to abort [a] fetus, a decision which, at least during the first trimester of pregnancy, is not subject to state interference." Berman v.

27

<u>Allan</u>, 80 <u>N.J.</u> 421, 430-32 (1979) (citations omitted). A wrongful birth claim is "predicated on a woman's right to determine for herself whether or not to continue or terminate her pregnancy" when it is anticipated the child will be born with birth defects. <u>Canesi v. Wilson</u>, 158 <u>N.J.</u> 490, 501 (1999).

Parents in wrongful birth actions in New Jersey may recover damages for the emotional distress caused by the loss of the option to abort the affected fetus, <u>Berman</u>, <u>supra</u>, 80 <u>N.J.</u> at 433-34, along with the economic costs associated with their child's affliction, <u>Schroeder v. Perkel</u>, 87 <u>N.J.</u> 53, 67-71 (1981). By contrast, under New York law, the parents' damages in such cases are limited to "the pecuniary expense . . . for the care and treatment of their infants." <u>Becker v. Schwartz</u>, 386 <u>N.E.</u>2d 807, 813-14 (N.Y. 1978). Parents may not recover emotional distress damages on such claims under New York law. <u>Foote v. Albany Med. Ctr. Hosp.</u>, 944 <u>N.E.</u>2d 1111, 1113 (N.Y. 2011) (noting that in such cases "the parents' 'legally cognizable injury' is 'the increased financial obligation arising from the extraordinary medical treatment rendered the child during minority'" (quoting <u>Bani-Esraili v. Lerman</u>, 505 <u>N.E.</u>2d 947, 948 (N.Y. 1987))); <u>accord</u> <u>Becker</u>, <u>supra</u>, 386 <u>N.E.</u>2d at 813-14; <u>Howard v. Lecher</u>, 366 <u>N.E.</u>2d 64, 65-66 (N.Y. 1977).

28

Apart from wrongful birth claims by parents, New Jersey separately recognizes what are known in this state as "wrongful life"[12] claims, which may be brought on behalf of infants born with congenital defects.  This limited cause of action allows an infant plaintiff in our state to "recover as special damages the extraordinary medical expenses attributable to his [or her] affliction," but disallows recovery by the infant for "general damages for emotional distress or for an impaired childhood." Procanik by Procanik v. Cillo, 97 N.J. 339, 342-43, 351-56 (1984); accord Moscatello ex rel. Moscatello v. Univ. of Med. & Dentistry of N.J., 342 N.J. Super. 351, 359-60, 363-64 (App. Div.), certif. denied, 170 N.J. 207 (2001).  By contrast, New York law does not permit such a claim for damages by or on behalf of an infant.  Alquijay v. St. Luke's-Roosevelt Hosp. Ctr., 473 N.E.2d 244, 245 (N.Y. 1984); Becker, supra, 386 N.E.2d at 813-14.

The two state's applicable statutes of limitations also have potential material differences.  New Jersey's statute of limitations for medical malpractice, N.J.S.A. 2A:14-2, is two years, subject to equitable tolling of that two-year period

---

[12] The terminology is somewhat confusing because what New Jersey law describes as a "wrongful birth" cause of action is described under New York law as a "wrongful life" claim. To prevent confusion we shall use the New Jersey terminology.

pursuant to our discovery rule, Lopez v. Swyer, 62 N.J. 267, 272-76 (1973). Conversely, New York's statute of limitations for medical malpractice claims is two-and-a-half years. See N.Y. C.P.L.R. 214-a (Consol. 2015) ("An action for medical . . . malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure[.]").

Under New York law, the accrual date for a cause of action for what is termed "wrongful life" in that state (i.e., "wrongful birth" in New Jersey) has been deemed to be the date of the child's birth. Pahlad v. Brustman, 823 N.Y.S.2d 61, 63 (N.Y. App. Div. 2006), aff'd, 865 N.E.2 1240 (N.Y. 2007); but see Jorge v. N.Y. City Health & Hosps. Corp., 590 N.E.2d 239, 240 (N.Y. 1992) (holding that the "continuous treatment" doctrine did not toll the statute of limitations on a medical malpractice claim premised upon alleged wrongful birth resulting from an erroneous reading of prenatal genetic tests). Because of these differences between New Jersey law and New York law, plaintiffs' claims might be considered untimely, depending upon which state's statute of limitations is applied.

B.

If, as here, an actual conflict of laws is present between the multiple states implicated in a case, the next step is to apply the Restatement's "most significant relationship" test, which New Jersey applies in tort cases. P.V., supra, 197 N.J. at 135-36, 139-43. Under the most significant relationship test in a case involving personal injury, the analysis:

> begins with the [Restatement] section 146 presumption that the local law of the state of the injury will apply. Once the presumptively applicable law is identified, that choice is tested against the contacts detailed in section 145 and the general principles outlined in section 6[13] of the

---

[13] Restatement, supra, § 6, which is entitled "Choice-of-Law Principles," provides as follows:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
>> (a) the needs of the interstate and international systems,
>>
>> (b) the relevant policies of the forum,
>>
>> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(continued)

31                                                          A-1387-14T3

Second Restatement. If another state has a more significant relationship to the parties or issues, the presumption will be overcome. If not, it will govern.

[P.V., supra, 197 N.J. at 136 (emphasis added).]

Hence, we must identify the place of injury under Restatement § 146, which states:

In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in [Restatement] § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

[(Emphasis added).]

"Section 146 [of the Restatement] recognizes the intuitively correct principle that the state in which the injury occurs is likely to have the predominant, if not exclusive, relationship to the parties and issues in the litigation."

(continued)
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

P.V., supra, 197 N.J. at 144 (citing Restatement, supra, § 146 cmt. d). However, this factor will not be afforded great significance where the place of injury was "fortuitous or . . . for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue." Restatement, supra, § 145, cmt. e.

Ignoring, for the moment, the defendant-specific aspects of this case and considering the core facts in their totality, New York is the primary, if not exclusive, state that is the place of injury. New York is the state where the Ginsbergs resided at the time of Tamar's pregnancy, and where they made their decision to proceed with the pregnancy. It is also the state where Tamar likely would have undergone prenatal testing of the fetus for Tay-Sachs had the couple been correctly informed that Ari was also a carrier for Tay-Sachs, and where the couple likely would have chosen to terminate the pregnancy if they learned that the child she was carrying was afflicted with Tay-Sachs. Alternatively, if Abigail's birth itself is viewed as the "injury" — particularly with respect to the child's wrongful life claim — then New York is also the place of injury because Abigail was born in that state.

Plaintiffs unpersuasively assert that the loss of reproductive choice occurred completely or dominantly in New

Jersey. They particularly focus in that regard on the alleged conception of Abigail in New Jersey.

A wrongful birth claim is inextricably intertwined with a pregnancy, and a woman's right to choose abortion rather than proceed with the pregnancy. At the time of Tamar's pregnancy, the couple resided in New York, and Tamar received prenatal care from a New York physician. The loss of reproductive choice with respect to Tamar's pregnancy with Abigail occurred exclusively, or at least mainly, in New York.

The fact that Abigail may have been conceived in New Jersey is immaterial to the choice-of-law analysis. For a wrongful birth claim, the focus must be on the decision to continue the pregnancy after the conception had occurred and the pregnancy became known to the couple. The location of the conception, through intercourse during a time when Tamar was ovulating, is fortuitous and irrelevant. If, hypothetically, Abigail had been conceived while plaintiffs were on vacation in Hawaii and there were no other relevant contacts with that state, Hawaii law surely would not govern plaintiffs' claims.

The trial court erred within its choice-of-law analysis by equating the place of injury with the place where plaintiffs experienced damage, i.e., the effects of the injury. It is irrelevant to the place-of-injury inquiry that plaintiffs

experienced emotional distress and some medical costs in New Jersey after that injury was inflicted. In this regard, the Third Circuit Court of Appeals in <u>Blakesley v. Wolford</u>, 789 <u>F.</u>2d 236, 241 (3d Cir. 1986), has aptly explained:

> In all personal injury actions, the effects of an injury necessarily follow a plaintiff to his or her state of residence or domicile. It is axiomatic that wherever the plaintiff lives, the effects of his or her personal injuries will be felt. However, looking to the place where the effects of an injury will be felt gives improper additional weight to the factor of the plaintiff's state of residence. In effect, by looking to the place where the injuries are <u>felt</u>, rather than the place where they in fact <u>occurred</u>, the district court gave double weight, which was unwarranted, to [plaintiff's] state of residence[.]

C.

Having identified New York as the place of injury, the next step we must follow in the choice-of-law analysis is the application of the factors set forth in <u>Restatement</u>, <u>supra</u>, §§ 6 and 145, and <u>P.V.</u>, <u>supra</u>, 197 <u>N.J.</u> at 145-55, "to determine whether another state has a more significant relationship to the parties or issues[,]" in which case the presumption of <u>Restatement</u>, <u>supra</u>, § 146 will be overcome. <u>P.V.</u>, <u>supra</u>, 197 <u>N.J.</u> at 155. The analysis of the relevant factors is qualitative, not merely quantitative. <u>Id.</u> at 147, 155-56; <u>Fu</u>,

supra, 160 N.J. at 125. In this regard, Restatement, supra, §
145 instructs:

> (1) The rights and liabilities of the
> parties with respect to an issue in tort are
> determined by the local law of the state
> which, with respect to that issue, has the
> most significant relationship to the
> occurrence and the parties under the
> principles stated in § 6.
>
> (2) Contacts to be taken into account in
> applying the principles of § 6 to determine
> the law applicable to an issue include:
>
>> (a) the place where the injury
>> occurred,
>>
>> (b) the place where the conduct
>> causing the injury occurred,
>>
>> (c) the domicil[e], residence,
>> nationality, place of
>> incorporation and place of
>> business of the parties, and
>>
>> (d) the place where the relationship,
>> if any, between the parties is
>> centered.
>
> These contacts are to be evaluated according
> to their relative importance with respect to
> the particular issue.
>
> [(Emphasis added).]

In applying these various factors here, we reject the trial
court's premise that the law of only one state can apply to all
of the issues in this lawsuit. As our Supreme Court made clear
in P.V., the "most significant relationship" test is to be
applied "on an issue-by-issue basis." P.V., supra, 197 N.J. at

143; accord Cornett v. Johnson & Johnson, 211 N.J. 362, 374 (2012); Erny v. Estate of Merola, 171 N.J. 86, 95 (2002); Grossman v. Club Med Sales, Inc., 273 N.J. Super. 42, 50-51 (App. Div. 1994). "Issue-by-issue" in this context means legal-issue-by-legal-issue. See, e.g., Cornett, supra, 211 N.J. at 374 (noting that an issue-by-issue analysis of choice-of-law factors "may result in the application of the law of more than one state to the several claims in a matter").

To date, no published opinion in our State has expressly addressed whether the issue-by-issue analysis of choice of law may be differentiated further with a defendant-by-defendant assessment. These appeals now require us to consider the novel question of whether choice-of-law principles could allow New York law to be applied to some of the named defendants or the third-party defendant in this case, while New Jersey law could apply to the other parties who have been sued.

We endorse the option of allowing a defendant-by-defendant approach to choice of law in a case such as this one for several reasons. First of all, such an approach happens to be authorized under New York law, which itself is instructive. See Boxer v. Gottlieb, 652 F. Supp. 1056, 1062 (S.D.N.Y. 1987) (citing Schultz v. Boy Scouts of Am., 480 N.E.2d 679 (N.Y.

1985)). Moreover, courts in several other states have similarly permitted that approach.[14]

Second, a defendant-by-defendant approach may have functional advantages. In some lawsuits, a plaintiff's legal claims and theories against multiple defendants may be predicated upon different facts occurring in different states at different times. A court should at least have the option in such multi-faceted cases to adopt a defendant-specific choice-of-law approach, rather than an overarching "one-law-fits-all" model. The reality is that the fact patterns, party domiciles, and legal theories in some civil cases that straddle state lines can have so many dimensions that it could be patently arbitrary

---

[14] See, e.g., Jaurequi v. John Deere Co., 986 F.2d 170, 173 (7th Cir. 1993) (reversing the district court's choice-of-law determination because it failed to conduct "a separate conflicts analysis for each defendant's conduct" in a product liability action); ABB Daimler-Benz Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp., 14 F. Supp. 2d 75, 88 (D.D.C. 1998) (noting that "[t]he law of different states may be applied to different defendants"); Kelly v. Johns-Manville Corp., 590 F. Supp. 1089, 1095 (E.D. Pa. 1984) (noting, in a "multi-defendant asbestos case, the plaintiff's separate claims are to be treated as discrete causes of action" with regard to choice of law); Allen v. Great Am. Reserve Ins. Co., 766 N.E.2d 1157, 1162-70 (Ind. 2002) (applying Indiana and South Carolina law to two different defendants for the same cause of action); but see Gregory v. Beazer E., 892 N.E.2d 563, 580 (Ill. App. Ct. 2008) (declining to adopt a defendant-by-defendant approach); Viking Pump, Inc. v. Century Indem. Co., 2 A.3d 76, 89 (Del. Ch. 2009) (noting that, in the context of insurance contracts, "Delaware courts have applied the law of the jurisdiction that bears the most significant relationship to the insurance coverage as a whole").

or unreasonable to ordain that all of the claims of all of the plaintiffs against all of the defendants must be adjudicated under a single state's laws.

Allowing a defendant-by-defendant approach is also consistent with the Supreme Court's observation in P.V., supra, 197 N.J. at 136, that "[i]f another state has a more significant relationship to the parties or issues, the presumption [of the law of the place of injury] will be overcome." (Emphasis added). This quoted passage from P.V. suggests that the nexus of each party to the case can be as relevant to the conflict analysis as the nexus of each issue.

We are acutely mindful that there can be practical difficulties in allowing the laws of more than one state to apply simultaneously to the evidence adduced at a trial. It is certainly simpler for a jury (or a judge in a bench trial) to apply only one state's legal rules to the factual proofs. Simplicity alone, however, is not the only value at stake. Indeed, the Supreme Court's endorsement of an issue-by-issue approach in P.V. signals that the mere use of more than one set of laws in a given case is not inherently untenable.

We have confidence that when proper jury instructions and a carefully-constructed verdict form are used, most jurors should be able to apply the laws of more than one state in the same

39

case to different respective defendants. See <u>Belmont Condo.</u> <u>Ass'n, Inc. v. Geibel</u>, 432 <u>N.J. Super.</u> 52, 97 (App. Div.) (expressing the oft-repeated maxim that jurors are presumed to follow the court's instructions), <u>certif. denied</u>, 216 <u>N.J.</u> 366 (2013). To simplify matters, the jurors need not be informed of the identity of each state that supplies the particular rule of law described in the jury charge and reflected in the queries posed on the verdict form.

In short, since an issue-by-issue approach is tenable, there is no reason to believe that a defendant-by-defendant approach is inherently untenable. That said, we are cognizant that a defendant-by-defendant approach to choice of law may be unworkable in, say, a mammoth case involving defendants from dozens of states.

Here, we have only two states whose laws are implicated. The practical and analytic complexities of a defendant-by-defendant approach do not appear to be overwhelming. In fact, in several of the reported cases from other jurisdictions using a defendant-by-defendant approach, the court did not find the approach too unwieldy.[15]

---

[15] <u>See, e.g.,</u> <u>Jauregui</u>, <u>supra</u>, 986 <u>F.</u>2d at 173; <u>ABB Daimler-Benz</u>, <u>supra</u>, 14 <u>F. Supp.</u> 2d at 88; <u>Great Am. Reserve</u>, <u>supra</u>, 766 <u>N.E.</u>2d at 1162; <u>Boxer</u>, <u>supra</u>, 652 <u>F. Supp.</u> at 1062.

For these reasons, we reject the trial court's premise, and the arguments raised by some of the present appellants, that the law of only one state can be applied to all of the defendants and to the third-party defendant Mt. Sinai.

Dr. Rubenstein, HUMC, and Durcan argue that a defendant-by-defendant approach is not appropriate here, even if that can be an option, because the totality of factual circumstances that led up to Abigail's birth dominantly occurred in New York. They assume that New York has "the most significant relationship" to the case as a whole, and therefore New York law should apply to their own conduct in New Jersey.

The New Jersey health care defendants suggest that plaintiffs and their counsel have strategically omitted any New York-based defendants from their complaint, including Dr. Samson, a New York-licensed physician, in order to maximize their chances of having facets of New Jersey law more favorable to plaintiffs govern this case.[16] That strategic assertion is

---

[16] This claim of strategic manipulation is somewhat analogous to a claim that a plaintiff engaged in the "improper joinder" of one or more additional defendants in a state court action for the sole purpose of destroying federal diversity jurisdiction and thereby preventing removal of the case. See, e.g., Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 571 n.1 (5th Cir. 2004) (describing such a pleadings tactic as improper joinder), cert. denied, 544 U.S. 992, 125 S. Ct. 1825, 161 L. Ed. 2d 755 (2005); Schwartz v. State Farm Mut. Auto. Ins. Co., 174 F.3d 875, 878 (7th Cir. 1999) (disapproving of the practice); AIDS
(continued)

neither endorsed nor opposed by Quest and Mt. Sinai. Plaintiffs, as we have already noted, assert they legitimately omitted Dr. Samson as a defendant, because they ultimately believed that he had not acted negligently.

Although the strategic claim raises concern, we need not pass upon the bona fides of plaintiffs' decision to refrain from suing Dr. Samson, or from naming in their complaint any other defendants who are domiciled in New York. Unless the litigants have omitted indispensable parties, see Rule 4:28-1 (regarding compulsory joinder), a court must adjudicate a case based upon the parties and claims that the litigants have chosen to include in the pleadings, rather than some hypothetical broader or different case that might have been brought.

No one has argued that Dr. Samson is an indispensable party who must be added to this litigation under Rule 4:28-1. See Bruno v. Mark MaGrann Assocs., Inc., 388 N.J. Super. 539, 547 (App. Div. 2006). In fact, none of the defendants nor Mt. Sinai have filed any third-party or fourth-party claims against Dr. Samson. He is not in this case. Even if he had been named, that would not necessarily require that New York law be applied

_____

(continued)
Counseling & Testing Ctrs. v. Group W Television, Inc., 903 F.2d 1000, 1003-04 (4th Cir. 1990) (noting how such a tactic can affect the crafting of a complaint).

to the conduct of the New Jersey health care defendants, who provided services in this state to the parents.

Our recognition of a defendant-by-defendant option for choice of law will serve to discourage the tactical structuring of pleadings that attempts to tilt the nexus analysis. If a defendant-by-defendant approach is available to the court, plaintiffs will have less incentive to attempt to stack a complaint with defendants from a state with laws more favorable to plaintiffs' litigational interests. Likewise, defendants will have less incentive to assert third-party claims against parties from a state with laws more favorable to their own interests, in a similar effort to have that state be deemed the one with the "most significant relationship" to the case.

Hence, in the present context, plaintiffs' inclusion of multiple New Jersey health care defendants in their complaint ought not work to their tactical advantage if, as we have held, the court is still free to allow New York law to apply to the other parties whose conduct occurred in New York. Under the approach we have endorsed, the court would not be constrained by the sheer number of defendants from New Jersey in deciding whether the claims arising in New York against the other parties should instead be governed by the law of that state.

A-1387-14T3

In short, by adopting here a rule that authorizes a party-specific approach to choice of law, we can deter and address manipulative efforts to stack a case with parties from states having laws that favor a pleader's interests. The approach eliminates a pleader's expectation that the law of only one "dominant" state will necessarily govern the case as a whole.

Consequently, there is no need to probe into the motivations of plaintiffs in refraining from naming Dr. Samson. If any gamesmanship has occurred here, a defendant-specific choice-of-law approach helps assure that such conduct is not rewarded. Moreover, as we explain more fully in Part II(D), infra, the strong policy interests of New York and New Jersey in having their respective laws regulate the conduct of health care defendants and laboratories operating within their borders also support a defendant-by-defendant approach.

D.

1.

With respect to Dr. Rubenstein, HUMC, and Durcan, it is especially significant that each of them is a professional or hospital located in, licensed in, and regulated by the State of New Jersey. Professionals and their patients have a reasonable expectation that the laws of the state of licensure will govern the professional licensee's activities within the state where

the services were provided.[17]  New Jersey has strong public policies in the regulation of health care professionals who are licensed in and who practice in this state, as well as the regulation of hospitals that are licensed in this state.[18]

At the time that Dr. Rubenstein treated and counseled Tamar, and at the time that HUMC and Durcan counseled her, she was a resident of New Jersey.  Those defendants' allegedly

---

[17] See, e.g., N.J.S.A. 2A:53A-26 and -27 (the affidavit of merit statute governing suits against professionals licensed in this state); see also N.J.S.A. 45:1-1 to -21.4 (stating general provisions related to professions and occupations regulated by state boards of registration and examination); N.J.S.A. 45:9-1 to -58 (stating provisions related to medicine and surgery); N.J.S.A. 26:2H-1 to -26 (documenting the various requirements of the "Health Care Facilities Planning Act"); N.J.S.A. 45:9-37.112 (stating that "the profession of genetic counseling profoundly affects the lives of the people of New Jersey").

[18] See Hernandez v. Overlook Hosp., 149 N.J. 68, 81 (1997) (noting New Jersey's "strong public policy of ensuring that only qualified physicians serve the public"); see also Bloom v. Clara Maass Med. Ctr., 295 N.J. Super. 594, 607 (App. Div. 1996) (noting that "[a] hospital's selection of medical staff is thus deeply embedded in public policy concerns and must be 'exercised reasonably and for the public good.'" (quoting Desai v. St. Barnabas Medical Ctr., 103 N.J. 79, 87 (1986))); N.J.S.A. 26:2H-1 ("It is hereby declared to be the public policy of the State that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health."); see also Cooper Univ. Hosp. v. Jacobs, 191 N.J. 125, 136 (2007).

tortious and injurious conduct — to the extent it is actionable — took place entirely in New Jersey. [19]

Although the New Jersey health care professionals apparently believe it is more advantageous to their litigational interests in this particular case to have the law of another state govern their conduct, there are very strong public policies and real-world expectations of professionals and patients that support applying to such professionals the law of the state in which they are licensed and in which they provided services to the plaintiff patient.

In this regard, we take judicial notice under N.J.R.E. 201 that patients frequently travel across state lines to be treated by a physician who is a surgeon or specialist because of that individual's expertise. Patients also may be drawn to a hospital in another state for the same reasons, or may have an emergency condition while they are in the state temporarily. In such circumstances, there should be a strong presumption that the laws of the state of licensure and treatment govern the patient's care in that state, subject to concerns of feasibility and fairness. The motion judge correctly recognized these

---

[19] We express no views, of course, about the merits of plaintiffs' claims, recognizing that discovery is not completed and that the time for dispositive motions by any party has not elapsed.

principles and public policies relating to the New Jersey health care professionals, but strayed in holding that New Jersey law must apply to all defendants in the case.

It is likewise reasonable for a person receiving medical services in New York, and for providers of such services in New York, to expect that New York law would govern the provision of those services. See Amoroso v. Burdette Tomlin Mem'l Hosp., 901 F. Supp. 900, 906 (D.N.J. 1995) (observing that medical defendants who provided plaintiff care in a state "have the right to expect that [the] law [of that state] will govern their actions"); accord Blakesley, supra, 789 F.2d at 243; Capone v. Nadig, 963 F. Supp. 409, 413-14 (D.N.J. 1997).

As we have noted, it is not unusual for people to travel out-of-state to be treated by specialists. As the Third Circuit Court of Appeals stated in Blakesley, supra, 789 F.2d at 243: "[I]t is only fair that the law of the state to which the patient has voluntarily traveled, and in which the doctor has chosen to conduct the [medical procedure], be applied to adjudicate the respective rights, duties, and obligations between the parties." Accord Warriner v. Stanton, 475 F.3d 497, 502-04 (3d Cir. 2007) (applying Delaware law in a medical malpractice case where plaintiff had traveled to Delaware for medical care).

A defendant professional's care should not be evaluated by the laws of another state simply because there are multiple other defendants in the case from different states. In our mobile society, patients frequently have been treated by doctors in a series of states when they move about the country.

Suppose, for instance, a patient is initially treated by his primary care physician in New Jersey, and then moves to Michigan, and then to California, where he is subsequently treated by physicians from each of the other two states. If that patient sues each of the doctors in the successive states for malpractice or negligence for a failure to detect and diagnose a cancerous tumor sooner, the New Jersey physician's own conduct presumptively should not be governed by Michigan law or California law. Yet, that would be the logical consequence of adopting the "one-law-fits-all" approach advocated by HUMC, Durcan, and Dr. Rubenstein in this case and adopted by the trial court. We reject that approach.

Consequently, although New York may be the dominant "place of injury" of plaintiffs in this case, as to the alleged specific conduct of HUMC, Durcan, and Dr. Rubenstein, New Jersey has strong linkages to plaintiffs' claims against those particular defendants.

Our defendant-by-defendant analysis of the nexus reaches a different conclusion as to defendant Quest and third-party defendant Mt. Sinai. Quest handled and reported on Ari's blood sample entirely in New York. Although Quest also coincidentally tested Tamar's own blood sample in New Jersey, no claims have been asserted about that accurate test concerning her specimen.

As a separate sovereign power, the state of New York also has a strong interest in regulating its clinical laboratories. See N.Y. Pub. Health Law § 570 (Consol. 2015) (stating that "proper performance of clinical laboratory and blood banking services is a matter of vital concern, affecting the public health, safety and welfare"); see also Daxor Corp. v. State Dep't of Health, 681 N.E.2d 356, 360 (N.Y. 1997), cert. denied, 523 U.S. 1074, 118 S. Ct. 1516, 140 L. Ed. 2d 669 (1998). New York additionally has a strong interest in regulating the conduct of its health care providers generally housed within its borders. See N.Y. Pub. Health Law § 2800 (Consol. 2015) (stating that "[h]ospital and related services including health-related service of the highest quality, efficiently provided and properly utilized at a reasonable cost, are of vital concern to the public health"); accord State Univ. of N.Y. v. Young, 566 N.Y.S.2d 79, 80 (N.Y. App. Div. 1991) (noting New York's "strong

public policy of providing high quality, efficient, and effective hospital services").

We recognize that Quest's principal place of business happens to be in New Jersey. However, the injury it allegedly inflicted here dominantly occurred in New York.

Quest's third-party claims for contribution against Mt. Sinai likewise have a strong nexus to New York. By all indications, Mt. Sinai's activities were confined to that state, the state where it is located and licensed as a hospital.

We do not reach Quest's contractually-based claims for indemnification against Mt. Sinai because the record is incomplete in that regard. That particular choice-of-law issue is reserved for the trial court, to be guided, to the extent that the contractual principles apply, by the principles of Restatement, supra, §§ 186 to 188 and related case law used for conflicts analysis in contracts matters. See N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 568 (1999).

### E.

We now turn to the several factors in Section 6 of the Restatement, which are cross-referenced in the tort provisions in Sections 145 and 146. Applying those Section 6 factors to this case supports the application of New Jersey law to the

conduct of Dr. Rubinstein, HUMC, and Durcan, and the application of New York law to the conduct of Quest and Mt. Sinai.

The Restatement advises that the Section 6 factors are not exclusive, and that they may be given varying weight depending upon the circumstances presented. Restatement, supra, § 6, cmt. c. Moreover, it is to be expected that, "in all but the simplest case," "some factors will point in different directions." Ibid. "[A]ny rule of choice of law, like any other common law rule, represents an accommodation of conflicting values." Ibid.

In areas such as tort law, where there is no precise choice-of-law rule or series of rules, all that can be done "is to state a general principle, such as application of the local law 'of the state of most significant relationship,'" and "look in each case to the underlying factors themselves in order to arrive at a decision which will best accommodate them." Ibid.

Distilling these concepts, our Supreme Court has instructed that, "[f]or purposes of an issue arising out of tort law, [the Section 6] factors may be grouped into five categories of interests: (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states," Fu, supra, 160 N.J.

at 122. "The most important of those [factors] is the competing interests of the states."  Erny, supra, 171 N.J. at 101.

We shall combine the first and fifth factors, which are closely related, in our analysis for ease of discussion.

    1. Interests of Interstate Comity and Competing Interests of the States

"Probably the most important function of choice-of-law rules is to make the interstate and international systems work well.  Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them."  Restatement, supra, § 6, cmt. d.  The court must consider the interests of the competing states, and whether application of a state's law would further that state's interests or frustrate the interests of another. P.V., supra, 197 N.J. at 152; Fu, supra, 160 N.J. at 122, 125; Restatement, supra, § 6, cmt. f; but see Restatement, supra, § 145, cmt. c ("This factor must not be overemphasized, however[, because] [t]o some extent, at least, every tort rule is designed both to deter other wrongdoers and to compensate the injured person.").

Causes of action for wrongful birth and wrongful life in New Jersey advance several interests. They include:   (1) promoting a woman's right to make an informed choice regarding whether to have a eugenic abortion; (2) regulating the conduct

of professionals who provide prenatal and genetic testing by deterring them from failing to provide women with complete and accurate information necessary to make an informed choice; and (3) compensating parents who lost their opportunity to make an informed choice, resulting in the unwanted birth of an afflicted child.

The first state interest, promoting a woman's right to make an informed choice regarding whether to have a eugenic abortion, would not likely be promoted by the application of New Jersey law to plaintiffs' claims. That is because plaintiffs' decision to choose an abortion would have occurred in New York, their state of residence at the time of the pregnancy, and not New Jersey.

However, the second state interest, regulating the conduct of professionals who provide prenatal and genetic testing, would be promoted by applying New Jersey law to the New Jersey health care defendants. As we have already noted, New Jersey has an interest in regulating the conduct of the physicians and genetic counselors who practice within the state's borders, such as Dr. Rubenstein and Durcan.[20]

---

[20] See N.J.S.A. 45:9-1 to -27.9 (regulating the practice of medicine); N.J.S.A. 45:9-37.111 to -37.120 ("Genetic Counselor's Licensing Act"); N.J.A.C. 13:35-1.1 to -14.18 (regulation of various medical professionals, including genetic counselors).

A-1387-14T3

As for Quest, and the laboratory at Mt. Sinai, such laboratories are regulated by both federal and state law. See 42 U.S.C.A. §§ 263a to 263a-7 (certification of laboratories, including embryo laboratories); 42 C.F.R. §§ 493.1 to 493.2001 (regulation of clinical laboratories); N.J.S.A. 45:9-42.1 to -42.25 ("Bio-analytical Laboratory and Laboratory Directors Act"); N.J.S.A. 45:9-42.26 to -42.45 ("New Jersey Clinical Laboratory Improvement Act"); N.J.A.C. 8:44-2.1 to -2.14 (operation of clinical laboratories); N.J.A.C. 8:45-1.1 to -1.3 (licensure of clinical laboratories); N.Y. Educ. Law §§ 8600 to 8610 (Consol. 2015) ("Clinical Laboratory Technology Practice Act"); N.Y. Pub. Health Law §§ 570 to 581 (Consol. 2015) (clinical laboratory and blood banking services); N.Y. Comp. Codes R. & Regs. tit. 10, §§ 19.1 to 19.4 (2015) (clinical laboratory directors), §§ 58-1.1 to 58-1.13 (2015) (approval of laboratories), §§ 58-3.1 to 58-3.9 (2015) (laboratory inspection and reference fees).

New York has an arguably stronger interest in regulating the testing of Ari's blood because all of that relevant conduct occurred in New York, with the actual testing performed in Mt. Sinai's laboratory in New York. See P.V., supra, 197 N.J. at 153 (noting that New Jersey courts "have continuously deferred to the rights of other jurisdictions to regulate conduct within

their borders. That is particularly so when the conduct is ongoing and directed towards residents and non-residents alike").

The third state interest relating to wrongful birth claims, i.e., compensating parents who lost their opportunity to make an informed choice, resulting in the unwanted birth of an afflicted child, has several dimensions here. The Ginsbergs are presently New Jersey residents, and hence that this state has some interest in seeing them fairly compensated for proven wrongs. However, they became New Jersey residents several years after they had already lost their opportunity to make an informed choice and had suffered the unwanted birth of an afflicted child, thus reducing this state's interest.

New York similarly has an interest in compensating its citizens for wrongful birth. A major difference, as pointed out, supra, in Part II(A), is that New York limits the available damages on such claims, and prohibits wrongful life claims asserted by the child.

New York's policies of limiting recovery for wrongful birth, and precluding claims for wrongful life, are entitled to considerable respect. See Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 629 (2007) (noting that the choice-of-law question is not which state has the better law; inquiry is limited to which

state has greater interest in applying its law to the claims); Fu, supra, 160 N.J. at 123 (observing that rules denying liability "are entitled to equal consideration in choice-of-law determinations as are rules imposing liability"); Restatement, supra, § 145, cmt. c (stating that "[a] rule which exempts the actor from liability for harmful conduct is entitled to the same consideration in the choice-of-law process as is a rule which imposes liability"); accord Blakesley, supra, 789 F.2d at 243 (recognizing that laws that limit medical malpractice liability may work a hardship on out-of-state patients, but they also provide a corresponding benefit, for example, by making available specialized procedures that may not otherwise be available).

Indeed, our own Supreme Court has recognized that the torts of wrongful birth and wrongful life are controversial, notwithstanding a woman's constitutional right to choose abortion. See, e.g., Procanik, supra, 97 N.J. at 349-50, 353-55 (surveying law from other states and noting dissenting opinions on our own Supreme Court); Schroeder, supra, 87 N.J. at 68 ("[T]he problems of wrongful conception and wrongful birth involve an evaluation not only of law, but also of morals, medicine and society. Thus, it is not surprising that the same issue may elicit divergent judicial responses."). Given that

controversy, the impetus for applying New Jersey's substantive law to such claims, conduct, and parties in another state is limited.

In sum, we conclude that the values of interstate comity and commerce would not be significantly affected by the application of New Jersey law to the New Jersey health care defendants. Conversely, New York's policies would be potentially frustrated by the application of New Jersey law to Quest and Mt. Sinai, for services that they each provided in New York.

2. Interests of the Parties

"Generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Restatement, supra, § 6, cmt. g. However, this Section 6 factor is of lesser importance in the field of torts than, for example, contract law. Restatement, supra, § 145 cmt. b; accord Fu, supra, 160 N.J. at 123.

> This is because persons who cause injury on non-privileged occasions, particularly when the injury is unintentionally caused, usually act without giving thought to the law that may be applied to determine the legal consequences of this conduct. Such persons have few, if any, justified expectations in the area of choice of law to

protect, and as to them the protection of justified expectations can play little or no part in the decision of a choice of law question. Likewise, the values of certainty, predictability and uniformity of result are of lesser importance in torts than in areas where the parties and their lawyers are likely to give thought to the problem of the applicable law in planning their transactions. Finally, a number of policies, such as the deterrence of tortious conduct and the provision of compensation for the injured victim, underlie the tort field. These policies are likely to point in different directions in situations where the important elements of an occurrence are divided among two or more states.

[Restatement, supra, § 145, cmt. b.]

On the facts of this case, the interests of the parties are consistent with applying New Jersey law to the New Jersey health care defendants, and New York law to Quest and Mt. Sinai. As we have already pointed out, it is reasonable for a person receiving medical services in New Jersey (such as Tamar, who was a New Jersey resident when she met with the New Jersey health care defendants) and Ari (who was a New York resident when his blood was tested in New York), and for providers of those services to expect that the law of the state where the services were provided would govern claims arising from those services. See Restatement, supra, § 146, cmt. e.[21]

---

[21] We ascribe little, if any, importance, to the present residency of Tamar and Ari in New Jersey, since they moved to
(continued)

### 3. Interests Underlying the Field of Law

This Section 6 factor requires "courts to consider the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law." Fu, supra, 160 N.J. at 123. "This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules." Restatement, supra, § 6, cmt. h. "In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved." Ibid.

"When the tort rule primarily serves a deterrent purpose, the state where the harmful conduct took place will likely have the dominant interest with respect to that rule." Fu, supra, 160 N.J. at 123. Alternatively, "when the tort rule is designed primarily to compensate a victim for his or her injuries, the state where the injury occurred, which is often where the plaintiff resides, may have the greater interest in the matter." Ibid. "Because every tort rule, to some extent, is designed

_____

(continued)
this state only a few months before filing their complaint and long after their claims accrued.

both to deter and to compensate, it is necessary to evaluate on a case-by-case basis the relative weight of those underlying purposes with respect to a specific rule."  Ibid.

This factor does not clearly weigh in favor of either New Jersey or New York, since both states' laws are designed to deter the alleged negligence in this case.  The laws of each state also provide injured plaintiffs with a remedy, albeit not the same remedy.

### 4. Interests of Judicial Administration

The Restatement advises that the interests of judicial administration are important values in all areas of the law:

> To the extent that they are attained in choice of law, forum shopping will be discouraged.  These values can, however, be purchased at too great a price.  In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules.  Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions.
>
> [Restatement, supra, § 6, cmt. i.]

However, the Restatement also recommends that the interests of administration should not be accorded too much weight.  See Restatement, supra, § 6, cmt. j ("Ideally, choice-of-law rules should be simple and easy to apply.  This policy should not be

overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results.  The policy does, however, provide a goal for which to strive.") (emphasis added); see also Fu, supra, 160 N.J. at 124 (noting that the interests of judicial administration "are of lesser importance and must yield to a strong state interest implicated by the remaining factors") (emphasis added).

The trial court found that the interests of judicial administration weigh in this case in favor of applying one state's law to all claims against all defendants, as doing so would simplify any trial.  That is certainly a pragmatic observation.  Nevertheless, given the circumstances here, imposing the law of either New Jersey (or New York) across the board to all of the defendants and Mt. Sinai indiscriminately would not be a sound or fair result.  Although we recognize the value of the ease of judicial administration, that Section 6 factor is "of lesser importance" and "must yield to the strong state interest[s] implicated."  Fu, supra, 160 N.J. at 124. Administrative ease therefore should not be dispositive in this particular case.

On the whole, some of the Section 6 factors weigh in favor of applying New Jersey law to the New Jersey health care defendants and New York law to the New York defendants, while

other factors are neutral as to which state's law should apply. Considering those factors qualitatively, and giving due regard for the divergent bases of the claims against the various defendants and against Mt. Sinai, and the competing interests of the states, we reach the following conclusions, on a defendant-by-defendant basis.

First, we hold that New York law applies to the tort-based claims asserted against Quest and Mt. Sinai. New York is the place of injury relating to those alleged wrongdoers. New York is also the state with the most significant relationship to those claims because New York is the state where Ari resided and sought the testing services at issue; it is the state where the alleged misconduct of those parties occurred; it is the state where those parties' relationships are centered; and New York has a greater interest than New Jersey in regulating Quest and Mt. Sinai under these circumstances. Additionally, to apply New Jersey law to those claims would substantially frustrate the interests of New York.

Conversely, we rule that New Jersey law should apply to the claims asserted against Dr. Rubenstein, HUMC, and Durcan. Even though New York is the dominant and perhaps exclusive place of plaintiffs' injury, New Jersey is the state with the most significant relationship to these particular claims. New Jersey

is where these specific defendants' alleged misconduct occurred; it is the location where those parties' relationships were centered; and it is reasonable to expect that New Jersey law would apply to the provision of medical and genetic counseling and hospital services in New Jersey. Moreover, as we have shown, New Jersey has a strong interest in regulating the provision of medical and genetic counseling services and hospitals in this state. Applying New York law to the New Jersey health care defendants would substantially frustrate that regulatory interest.

In sum, we conclude that the Section 6 and the other Restatement factors support the use of a defendant-specific approach to choice of law in this case. Under that approach, New Jersey law will apply to the claims asserted against the New Jersey health care defendants, and New York law will apply to Quest and Mt. Sinai.

F.

That brings us to various subsidiary questions. First, we consider what law governs the cross-claims asserted by and among the New Jersey health care defendants (i.e., HUMC, Durcan, and

63

Dr. Rubenstein) and the New York parties (i.e., Quest[22] and Mt. Sinai).

As a general matter, a claim of non-contractual indemnification is derivative of the underlying claim against the party seeking to be indemnified. See Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 525 (2008) (recognizing, in the context of insurance, that contribution claims are derivative of a party's right to assert an underlying claim); see also Tucker v. Allstate Ins. Co., 195 N.J. Super. 230, 233-34 (App. Div. 1984) (not permitting a derivative claim for contribution by another insurer relative to a void policy).

This derivative aspect poses a potential problem in identifying the applicable state law of contribution, insofar as the New York parties' cross-claims against the New Jersey defendants conceivably would be analyzed under New York law, while the opposing cross-claims by the New Jersey defendants against the New York parties would be conceivably analyzed under New Jersey law. Both state's laws, to the extent they may differ, cannot simultaneously apply in opposite directions. For example, it is unclear whether the New York parties, who are not

---

[22] For ease of this contribution discussion, we refer to Quest as a "New York" party, even though Quest's principal place of business is New Jersey, because its allegedly harmful conduct took place in New York.

liable for wrongful life under New York law, could be liable for cross-claims asserted against them by the New Jersey health care defendants.

We need not enter this analytic thicket at this time. For one thing, the identities of the parties at the ultimate time this case is concluded, whether by settlement, dismissal, or trial, remains to be seen. Some or all of the cross-claim problems may be mooted, depending upon which claims and parties are ultimately left in the case. We do not in this interlocutory appeal have to resolve those cross-claim questions now. Instead, we defer them to the trial court for resolution at a later time, when it shall be guided by the "most significant relationship" analysis. See Restatement, supra, § 173 (instructing that the "most significant relationship" test of Section 145 should determine "whether one tort feasor has a right to contribution or indemnity against another tort feasor").

Second, despite the guidance we are providing in this opinion, we do not completely foreclose the trial court from re-examining the choice-of-law aspects of this case at the time of trial. We appreciate that the parties and the trial court typically have a strong need to have the governing choice-of-law identified as early as possible in the life of a case. The

parties will surely pursue discovery, including expert reports, addressing the applicable state-specific standards of care guided by that determination. Any dispositive motions filed will also be guided accordingly.

Even so, we recognize that in rare and extraordinary circumstances, there may be pragmatic or equitable reasons to revisit choice of law at the time of trial to verify that the court's initial assessment of the "most significant relationship" of states to the viable issues or claims is still valid, and that it can be feasibly implemented in jury instructions and on the verdict form.

Although we do not at all imply that this case will prove to be such a rare and exceptional circumstance, we reserve to the trial court the ultimate authority to reconsider the choice-of-law analysis at the time of trial. Such further review, if it is conducted at all, must be guided by the principles we have stated in this opinion. At that juncture, the trial court must consider how cross-claims among any remaining defendants or third-party defendants should be adjudicated, and what state's law applies to any contractual indemnification claims that may also remain.

A choice-of-law ruling made before trial is interlocutory in nature, and as such, can be revisited by the court in its

"sound discretion." Lombardi v. Masso, 207 N.J. 517, 534 (2011) (quoting Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987), certif. denied, 110 N.J. 196 (1988)). Indeed, Quest and Mt. Sinai both acknowledge the court's inherent authority to revisit an original choice-of-law ruling, but urge that such authority be exercised very sparingly. Plaintiffs likewise express concerns about reconsidering the choice-of-law assessment after substantial resources have been invested in a case.

We agree that an alteration of the choice-of-law ruling should be done only in truly exceptional circumstances where it would be simply unworkable or unjust to carry out the original choice-of-law ruling at trial. On the other hand, we reject the rigid positions of HUMC, Durcan, and Dr. Rubenstein that the court's original choice-of-law rulings is an immutable "law of the case." See Lombardi, supra, 207 N.J. at 539-40.

G.

Since they were not specifically addressed by the trial court and were not fully briefed by all parties in these interlocutory appeals, we decline to pass upon the discrete choice-of-law issues concerning the applicable statutes of limitations. We do instruct that such analysis likewise may proceed on a defendant-by-defendant approach rather than a

67                                                                      A-1387-14T3

"global" approach. In particular, the trial court shall apply the specific choice-of-law principles for statute of limitations purposes expressed by the Supreme Court in Cornett, supra, 211 N.J. at 374-79. The trial court may also consider pertinent concepts under Section 142 of the Restatement to the extent those Restatement concepts are consistent with decisional law in our State.

H.

For all of these reasons, the trial court's choice-of-law decision and its corresponding orders dated September 26, 2014 respecting choice of law are reversed in part, consistent with this opinion.

The matter is remanded to the trial court for the completion of the case. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION