**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3741-23
     A-3742-23
     A-3743-23
     A-3878-23
     A-3879-23
     A-3882-23

AMEENAH LITTLE, DEA
SHINIQUE RAMSEY, RACHEL
GNADINGER, DARINA
BELOKRYLETS and CAROL
DIORIO, and PRANVERA
KELMENDI, on behalf of
themselves,

  Plaintiffs-Respondents,

v.

AMERICAN INCOME LIFE
INSURANCE COMPANY,
GIGLIONE-ACKERMAN
AGENCY, LLC, ERIC GIGLIONE,
and DAVID ACKERMAN,

  Defendants-Appellants,

and

MORGAN LOBELLO and
RICHARD ZUCCATO, individually,

jointly, and/or severally,

      Defendants-Respondents.

_____

RAYNALDO LAFONTANT, on
behalf of himself,

      Plaintiff-Respondent,

v.

AMERICAN INCOME LIFE
INSURANCE COMPANY,
GIGLIONE-ACKERMAN
AGENCY, LLC, ERIC GIGLIONE,
and DAVID ACKERMAN,

      Defendants-Appellants.

_____

ATIYA BELL, on behalf of
herself,

      Plaintiff-Respondent,

v.

AMERICAN INCOME LIFE
INSURANCE COMPANY,
GIGLIONE-ACKERMAN
AGENCY, LLC, ERIC GIGLIONE,
and DAVID ACKERMAN,

      Defendants-Appellants,

and

2

MORGAN LOBELLO, and
RICHARD ZUCCATO, individually,
jointly, and/or severally,

       Defendants-Respondents.

_____

Argued March 5, 2025 – Decided May 30, 2025

Before Judges Marczyk, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket Nos. L-0417-24, L-0418-24, and L-0419-24.

Jeffrey Hammer (King & Spalding LLP) of the California bar, admitted pro hac vice, argued the cause for appellant American Income Life Insurance Company in A-3741-23, A-3742-23 and A-3743-23 (O'Toole Scrivo, Jeffrey Hammer and Ramon A. Miyar (King & Spalding LLP) of the California bar, admitted pro hac vice, attorneys; Thomas P. Scrivo, Michael J. Dee, Joseph R. Marscio, Jeffery Hammer, and Ramon A. Miyar, on the briefs).

Andy G. Mercado argued the cause for appellants Giglione-Ackerman Agency, LLC, Eric Giglione, and David Ackerman in A-3878-23, A-3879-23 and A-3882-23 (Ogletree, Deakins, Nash, Smoak & Stewart, PC, attorneys, join in the briefs of appellant American Income Life Insurance Company).

David Tykulsker argued the cause for respondents (David Tykulsker & Associates, and Ria Julien and Retu Singla (Julien, Mirer, Singla, & Goldstein PLLC), of the New York bar, admitted pro hac vice, attorneys;

David Tykulsker, Ria Julien, and Retu Singla, on the brief).

PER CURIAM

Defendants[1] appeal from trial court orders, dated June 25, 2024, denying their motions to compel arbitration and stay the Law Division matters. Because we conclude the parties' Arbitration Agreement failed to comport with <u>Atalese v. U.S. Legal Services Group, L.P.</u>, 219 N.J. 430 (2014), we affirm.

I.

Our focus is on the appropriate forum—the courtroom or arbitration—for plaintiffs' claims. Defendants' motions were filed before discovery, therefore, we use the allegations from plaintiffs' complaints to provide a brief factual background. "American Income Life Insurance Company [(AIL)] is an Indiana corporation with its headquarters located [in] . . . Texas." "Giglione-Ackerman Agency, LLC [(GAA)] . . . is a New Jersey Limited Liability Company and the exclusive broker of AIL products in New Jersey as the State General Agent of AIL." Eric Giglione (Giglione) and David Ackerman (Ackerman) are "co-owner[s] and manager[s] of" GAA and residents of New Jersey. Morgan Lobello (Lobello) is "a Regional General Agent . . . for AIL based out of" GAA,

---

[1] The appellants in this matter are American Income Life Insurance Company, Giglione-Ackerman Agency, LLC, Eric Giglione, and David Ackerman.

and Richard Zuccato (Zuccato) "is a Managing General Agent . . . for AIL based out of" GAA, and they both reside in New Jersey.[2]

Plaintiffs were former employees of defendants. Plaintiffs acknowledge they signed a General Agent Contract that included an Arbitration Agreement. While so employed, they contend defendants violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, and filed complaints in the Law Division.

In lieu of filing answers, defendants moved to compel arbitration and stay the Law Division matters. On May 29, 2024, the trial court heard the parties' arguments on defendants' motions. At the conclusion of the parties' arguments, the trial court reserved its decision.

On June 25, 2024, the trial court executed the orders denying defendants' motion to compel arbitration and stay the matters. In a twenty-two-page written opinion, the court reached the following conclusions: (1) arbitration agreements are favored but may be invalidated under the Federal Arbitration Act (FAA)[3]

---

[2] Plaintiff Raynaldo Lafontant did not name Lobello or Zuccato in his complaint.

[3] 9 U.S.C. §§ 1 to 16. 9 U.S.C. § 2 provides: "[A]n agreement in writing to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

and the New Jersey Arbitration Act (NJAA);[4] (2) a plain reading of the Arbitration Agreement "does not lead a reader to believe that issues relating to arbitration and enforceability of the Agreement would apply Texas law," but instead, a "plain reading of the Agreement provides that Texas law does not apply to issues of enforceability but does apply on issues relating to claims arising out of the contract"; (3) a conflict of law exists between New Jersey, which "requires that there be a clear and explicit waiver of the judicial forum and right to a jury trial to form a valid contract," citing Atalese, and Texas, where there is "no such requirement," citing In re Poly-America, L.P., 262 S.W.3d 337, 349 (Tex. 2008); (4) a choice-of-law analysis, in the contract setting, required New Jersey law be applied because "the relevant policy interest of the [S]tate of New Jersey is significant," stating Restatement (Second) Conflicts of Law § 6(2) cmt. e (Am. L. Inst. 1971) "and subsequent case law[, Fairfax Financial Holdings Limited v. S.A.C. Capital Management, LLC, 450 N.J. Super. 1 (App. Div. 2017),] both reflect[] that the state that is most deeply affected should have its laws applied," and "alleged LAD violations . . . have routinely [been] recognized as one of the [c]ourt's 'highest priorities'"; (5)

_____

[4] N.J.S.A. 2A:23B-1 to -36.  N.J.S.A. 2A:23B-6 provides:  "An agreement . . . to arbitrat[e] . . . is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."

<u>Atalese</u> was not "pre-empted" by <u>Kindred Nursing Centers Limited Partnership v. Clark</u>, 581 U.S. 246 (2017); and (6) the Arbitration Agreement did "not contain language sufficient under New Jersey law" because "New Jersey contracts must be clear and unambiguous that an employee is choosing to arbitrate disputes, rather than have them resolved in [a] court of law," citing <u>Atalese</u>, 219 N.J. at 448.

## II.

On appeal, defendants contend the trial court erred because: (1) the FAA governs the Arbitration Agreement and all doubts must be resolved in favor of arbitration; (2) Texas law applies to issues of validity and formation of the Arbitration Agreement, in fact, the parties contractually selected Texas law when not displaced by the FAA; (3) New Jersey's choice-of-law analysis requires application of Texas law; (4) <u>Kindred Nursing</u> preempts <u>Atalese</u>'s "clear statement rule"; and (5) the Arbitration Agreement was enforceable under <u>Atalese</u>.

Our review considers: (A) issues related to choice-of-law and (B) the viability of <u>Atalese</u> and its application to the parties' Arbitration Agreement.

## Choice-of-Law

We apply a de novo standard of review to choice-of-law determinations. See Ginsberg ex rel. Ginsberg v. Quest Diagnostics, Inc., 441 N.J. Super. 198, 223 (App. Div. 2015). "The choice-of-law principles of the forum state [here, New Jersey,] control the analysis." Ibid.

The pertinent part of the Arbitration Agreement provides:

> The parties acknowledge that this [c]ontract involves interstate commerce, and all issues relating to arbitration or the enforceability of this agreement to arbitrate shall be governed by the [FAA] . . . . Aside from issues relating to arbitration or the enforceability of this agreement to arbitrate, all issues relating to any dispute, claim, or controversy arising out of or relating to this [c]ontract shall be governed by and decided in accordance with the internal laws of the State of Texas, without regard to its choice-of-law rules.

Defendants argue this language evinces the parties' selection of Texas law to control issues regarding the "validity and formation" of the Arbitration Agreement. Defendants contend "[i]ssues relating to 'arbitration or . . . enforceability' refer to the FAA's two-step analytical framework for determining whether an arbitration agreement is enforceable as to a particular dispute or claim . . . ." Defendants assert the "concepts [of arbitration and enforceability] are distinct from the 'validity' and 'formation' of the underlying contract, which must be decided under applicable state law." Therefore, defendants argue Texas

8

law applies because "[t]he parties agreed that 'all issues' other than arbitrability and enforceability—including validity and formation—are governed by Texas law."

Plaintiffs counter that defendants "resort to a tortured logic to distinguish enforceability from the validity of the Arbitration Agreement. These are [not] distinguishable concepts.[5] A [c]ourt may not enforce an invalid agreement." Plaintiffs argue "validity is a necessary part of enforceability, the analyses are not distinct but rather one is constituent of the other."

We consider the concepts of contract "validity and formation" to be separate from the enforceability of a contract. While plaintiffs may be correct that a court cannot enforce an invalid agreement, a court may find that a valid agreement is unenforceable. Indeed, 9 U.S.C. § 2 provides "an agreement . . . to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Therefore, "[l]ike other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Car, W., Inc. v. Jackson, 561 U.S. 63, 68 (2010) (quoting Doctor's Assocs. Inc. v. Casarotto, 517 U.S. 681, 687 (1996)); see also

---

[5] We assume plaintiffs meant "[t]hese are not distinguishable concepts."

Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299-300 (2010) ("[O]ur precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor . . . its enforceability . . . is in issue.") (emphasis added); Delta Funding Corp. v. Harris, 189 N.J. 28, 39 (2006) ("Generally recognized contract defenses, such as duress, fraud, and unconscionability, can justify judicial refusal to enforce an arbitration agreement.").[6]

Therefore, recognizing the multi-tiered analysis, we turn to the parties' Arbitration Agreement to determine whether the parties made a choice-of-law regarding the formation of the agreement. "As with other contractual provisions, courts look to the plain language the parties used in the arbitration provision." Medford Twp. Sch. Dist. v. Schneider Elec. Bldgs. Ams. Inc., 459 N.J. Super. 1, 8 (App. Div. 2019).

---

[6] Here, we recognize the distinction between "validity and formation" and "enforceability" is not an obvious one. In other words, under Atalese, an "[in]valid" arbitration agreement could not be "enforce[d]" because it was doomed at "formation." We are not confronted with the clearer circumstance where the parties "form[ed]" a "valid[]" Atalese arbitration agreement, but it was not "enforceab[le]" because of other "formation" circumstances such as "duress, fraud, and unconscionability." Nonetheless, we engage in the required multi-tiered analysis.

The language of the Arbitration Agreement provides:

> [A]ll issues relating to arbitration or the enforceability of this agreement to arbitrate shall be governed by the [FAA] . . . . Aside from issues relating to arbitration or the enforceability of this agreement to arbitrate, all issues relating to any dispute, claim, or controversy arising out of or relating to this [c]ontract shall be governed by and decided in accordance with the internal laws of the State of Texas, without regard to its choice-of-law rules.

We conclude a plain reading of the Arbitration Agreement reveals the parties chose Texas law, as opposed to the FAA, to control formation issues because formation, as discussed, is distinguishable from "arbitration and enforceability."

However, our conclusion as to the parties' choice-of-law does not necessarily mandate that Texas law governs the formation of the Arbitration Agreement. "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." Instructional Sys., Inc. v. Comput. Curriculum Corp., 130 N.J. 324, 341 (1992). To override the parties' contractual choice-of-law, a court must find:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

11

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, <u>or</u>

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under § 188, would be the state of the applicable law in the absence of an effective choice[-]of[-]law by the parties.

[<u>Restatement (Second) Conflict of L.</u> § 187 (Am. L. Inst. 1988) (emphasis added).]

See also <u>Instructional Sys.</u>, 130 N.J. at 341; <u>N. Bergen Rex Transp. v. Trailer Leasing Co.</u>, 158 N.J. 561, 568-69 (1999); <u>Kramer v. Ciba-Geigy Corp.</u>, 371 N.J. Super. 580, 589 (App. Div. 2004).

Under Restatement § 187 subsection (a), defendants argue "Texas has a substantial relationship to both AIL and the dispute here: AIL is headquartered in Texas and administers its policies in Texas . . . which conclusively establishes a 'substantial relationship' with Texas under New Jersey choice-of-law rules."

Plaintiffs contend "Texas has no substantial relationship to the discrimination alleged in the [c]omplaint[s]." Instead, plaintiffs assert they

> were employed to perform work in New Jersey . . .; signed the contract to work for a joint employer including a New Jersey LLC with a New Jersey headquarters . . .; the vast majority of the discrimination occurred in New Jersey . . .; the unlawful acts were done by New Jersey based managers . . .; and [p]laintiffs have never worked in Texas.

Plaintiffs' focus on New Jersey's "substantial relationship to the parties or the transaction" misses the mark because the required analysis must be between the chosen state, Texas, and the "the parties or the transaction." Ibid. In North Bergen Rex Transport, the New Jersey Supreme Court held "[t]he substantial relationship standard under the Restatement ha[d] been met . . . because [the defendant wa]s headquartered in" the state the parties chose in their contract. 158 N.J. at 569; see also Instructional Sys., 130 N.J. at 342 ("[Because the defendant] is headquartered in California, . . . California law has a 'substantial relationship to the parties.'"). Therefore, we conclude, under subsection (a), Texas has the required "substantial relationship" because AIL is headquartered in Texas.

However, the Restatement's test is stated in the disjunctive, "or," so we consider under § 187 subsection (b) whether applying Texas law would be

"contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under § 188, would be the state of the applicable law in the absence of an effective choice[-]of[-]law by the parties." Restatement (Second) Conflict of L. § 187.

Defendants contend "[p]laintiffs' argument that the application of Texas law to this dispute would be contrary to New Jersey's public policy . . . is unpersuasive given both Texas and New Jersey broadly favor arbitration." Defendants' focus on the favorability of arbitration is misguided as plaintiffs acknowledge "arbitration agreements are favored."

Instead, the focus must be on how each states' laws address the contractual waiver of rights. Plaintiffs note "[t]here is no question that Texas does not require a clear and explicit waiver requirement with regard to [c]onstitutional and statutory rights," citing Poly-America L.P., 262 S.W.3d at 349.[7] On the contrary, plaintiffs assert New Jersey's "clear and express waiver principle is a general contract principle" applicable to all "New Jersey contracts that purport to waive a statutory or [c]onstitutional right," citing Atalese.

_____

[7] During oral argument in the trial court, defendants' counsel acknowledged "[t]here[ i]s a conflict between New Jersey and Texas law."

We conclude Texas's law is "contrary to the fundamental policy of" New Jersey. The New Jersey Supreme Court has stated that "under New Jersey law, any contractual 'waiver-of-rights provision must reflect that [the party] has agreed clearly and unambiguously' to its terms." Atalese, 219 N.J. at 443 (alteration in the original). The Court explained: "[o]ur jurisprudence has stressed that when a contract contains a waiver of rights . . . the waiver 'must be clearly and unmistakably established.'" Id. at 444 (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., 168 N.J. 124, 132 (2001)). As discussed more fully below, the Court detailed the universal application of this law across multiple contractual scenarios. See id. at 443-44. Texas's law does not have a "clear and explicit waiver requirement," and therefore runs contrary to "the fundamental policy of" New Jersey.

Next, we consider whether New Jersey has a "materially greater interest than [Texas] in the determination of the particular issue." Restatement (Second) Conflicts of L. § 187(2)(b). New Jersey's law requires "reasonable notice" so a party understands they are waiving important rights. Atalese, 219 N.J. at 447. Texas law does not afford its contracting parties the same level of protection. Under these circumstances, we conclude New Jersey has a greater interest in applying its law to the particular circumstances than does Texas. See Newcomb

15

v. Daniels, Saltz, Mongeluzzi & Barrett, 847 F. Supp. 1244, 1248-49 (D.N.J. 1994) (citing Winer Motors, Inc. v. Jaguar Rover Triumph, Inc., 208 N.J. Super. 666 (App. Div. 1986)).

Lastly, § 187 (2)(b) requires a consideration "under § 188, [of what] would be the state of the applicable law in the absence of an effective choice[-]of[-]law by the parties."[8]

Under § 188:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice[-]of[-]law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> > (a) the place of contracting,
> >
> > (b) the place of negotiation of the contract,
> >
> > (c) the place of performance,
> >
> > (d) the location of the subject matter of the contract, and

---

[8] Defendants assert a § 188 analysis is "incorrect[]" because "[h]ere, there is clearly a choice-of-law clause."

16

(e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied . . . .

[Restatement (Second) Conflicts of L. § 188 (Am. L. Inst. 1971).]

Moreover, § 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice[-]of[-]law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[Restatement (Second) Conflict of L. § 6 (Am. L. Inst. 1971).]

"[S]ubparagraph (2) of § 188 identifies the contacts to be considered when applying the § 6 factors." Cont'l Ins. Co. v. Honeywell Int'l, Inc., 234 N.J. 23, 46, 52 (2018).

Plaintiffs contend the § 188 Restatement factors weigh in favor of applying New Jersey law. Plaintiffs argue factors: (a) the contracts were signed in New Jersey so it is the place of contracting; (b) is inapplicable because there was no contract negotiation; (c) New Jersey was the place of their performance and GAA's "sole territory was . . . New Jersey"; (d) New Jersey was the "location of the subject matter of the contract" because: (i) the agreement was to facilitate sales to New Jersey residents and plaintiffs could only sell to New Jersey consumers, and (ii) GAA was "AIL's State General Agent in New Jersey"; and (e) New Jersey was: (i) generally the domicile and place of residence of plaintiffs, and "[d]efendants Ackerman, Giglione, Lobello and Zuccato," (ii) "AIL sells insurance in New Jersey and its CEO performed work in New Jersey," (iii) GAA "is . . . AIL's State General Agent in New Jersey [and has its] principal

18

place of business in New Jersey," (iv) GAA is a New Jersey Limited Liability Corporation; and (v) all parties conduct business in New Jersey.

We are convinced the § 188 factors weigh in favor of applying New Jersey law to the Arbitration Agreement.

For the sake of completeness, we address one other issue. Even if we concluded that "enforceability," under these circumstances, was one with "validity and formation," we would still determine New Jersey law applies.

The Arbitration Agreement plainly provides "all issues relating to arbitration or the enforceability of this agreement to arbitrate shall be governed by the" FAA. The FAA does not provide substantive guidance regarding which state's law controls when a choice-of-law provision is not contained in an arbitration agreement. In Mastrobuono v. Shearson Lehman Hutton, the U.S. Supreme Court suggested that under the FAA, where a "contract, without a choice-of-law provision, had been signed in New York and was to be performed in New York, presumably 'the laws of the State of New York' would apply, even though the contract did not expressly so state." 514 U.S. 52, 59 (1995). Therefore, under Mastrobuono, New Jersey's law would apply.

In addition, "when a civil action is brought in New Jersey, we use New Jersey choice-of-law rules to decide whether this [S]tate's or another state's legal

framework should be applied." Cont'l Ins., 234 N.J. at 46 (2018). New Jersey courts rely on Restatement § 188. Id. at 52-53. "Section 188 . . . generally addresses conflicts-of-law determinations in contract settings where the parties have not made an effective choice of law." Id. at 52.

Therefore, because the § 187 analysis required a determination under § 188, and we have concluded the § 188 analysis would have led to the application of New Jersey law, we similarly conclude that a stand-alone—no choice-of-law—§ 188 analysis would result in the application of New Jersey law.

Kindred Nursing - Atalese

Having determined that New Jersey law controls the formation and "validity and enforceability" of the parties' Arbitration Agreement, we must determine whether Atalese is still controlling law or, as defendants assert, whether it was preempted or overruled in Kindred Nursing.

In Atalese, the New Jersey Supreme Court recognized the FAA "enunciate[s] . . . [a] polic[y] favoring arbitration." Atalese, 219 N.J. at 440. Further, that "[t]he FAA requires courts to 'place arbitration agreements on an equal footing with other contracts and enforce them according to their terms.'" Id. at 441 (quoting AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011)). Therefore, "'a state cannot subject an arbitration agreement to more

burdensome requirements than' other contractual provisions." Ibid. (quoting Leodori v. CIGNA Corp., 175 N.J. 293, 302 (2003)). Nor can an arbitration clause "be invalidated by state-law 'defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" Ibid. (quoting Concepcion, 563 U.S. at 339).

However, "[a]rbitration's favored status does not mean that every arbitration clause, however phrased, will be enforceable." Ibid. Indeed, 9 U.S.C. § 2 "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses.'" Ibid. (quoting Concepcion, 563 U.S. at 339). Therefore, "the FAA 'permits states to regulate . . . arbitration agreements under general contract principles,' and a court may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of any contract.'" Ibid. (quoting Martindale v. Sandvik, Inc., 173 N.J. 76, 85 (2002) (quoting 9 U.S.C. § 2)).

"[U]nder New Jersey law, any contractual 'waiver-of-rights provision must reflect that [the party] has agreed clearly and unambiguously' to its terms." Id. at 443 (second alteration in original) (quoting Leodori, 175 N.J. at 302). This contractual requirement is not limited to arbitration clauses, but instead has broad and general application. The Court noted:

The requirement that a contractual provision be sufficiently clear to place [one] on notice that he or she is waiving a constitutional or statutory right is not specific to arbitration provisions. Rather, under New Jersey law, any contractual "waiver-of-rights provision must reflect that [the party] has agreed clearly and unambiguously" to its terms. Leodori, . . . 175 N.J. at 302; see, e.g., Dixon v. Rutgers, the State Univ. of N.J., 110 N.J. 432, 460-61 (1988) (holding that collective bargaining agreement cannot deprive one of statutory rights to evidentiary materials in anti-discrimination case because "[u]nder New Jersey law[,] for a waiver of rights to be effective it must be plainly expressed"); Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ., 78 N.J. 122, 140 (1978) (explaining, in public-employment labor-relations context, that any waiver of statutory right to file grievances "must be clearly and unmistakably established"); W. Jersey Title & Guar. Co., [v. Indus. Trust Co.,] . . . 27 N.J. [144], 152-53 [(1958)] ("It is requisite to waiver of a legal right that there be a clear, unequivocal, and decisive act of the party . . . . Waiver presupposes a full knowledge of the right and an intentional surrender . . . ." (citations and internal quotation marks omitted)); Christ Hosp. v. Dep't of Health & Senior Servs., 330 N.J. Super. 55, 63-64 (App. Div. 2000) (requiring "clear and unmistakable waiver" of statutory right to hearing following refusal to renew license); Franklin Twp. Bd. of Educ. v. Quakertown Educ. Ass'n, 274 N.J. Super. 47, 53 (App. Div. 1994) (holding that waiver of court-ordered, strike-related expenses must be "clear and unmistakable" (citation and internal quotation marks omitted)); Otis Elevator Co. v. Stafford, 95 N.J.L. 79, 82, 111 A. 695 (Sup.[]Ct.[]1920) ("Clear and unmistakable evidence is necessary to hold that the right to file a [mechanics'] lien has been waived."); Amir v. D'Agostino, 328 N.J. Super. 141, 160 (Ch. Div. 1998) (holding that waiver of statutory rights under

22

Condominium Act requires that party "kn[ow] that there [i]s a statutory protection available and then elect[] to waive it" because "conduct that purports to constitute a waiver must be clear and unmistakable"), aff'd o.b., 328 N.J. Super. 103, 105 (App. Div. 2000) . . . .

[Atalese, 219 N.J. at 443-44. (second, third, fourth, tenth, eleventh, twelfth, and thirteenth alterations in the original).]

Against this backdrop we consider whether Kindred Nursing preempted or overruled Atalese. In Kindred Nursing, the United States Supreme Court stated that 9 U.S.C. § 2 "establishes an equal-treatment principle: A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' . . . but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" 581 U.S. at 251 (quoting Concepcion, 563 U.S. at 339). Therefore, "[t]he FAA . . . preempts any state rule discriminating on its face against arbitration . . . and displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements." Ibid.

In Kindred Nursing, the United States Supreme Court considered the Kentucky Supreme Court's invalidation of an arbitration agreement. The Kentucky Supreme Court explained, "[t]he Kentucky Constitution, . . . protects

23

the rights of access to the courts and trial by jury; indeed, the jury guarantee is the sole right the Constitution declares 'sacred' and 'inviolate.'" Ibid. (quoting Extendicare Homes, Inc. v. Whisman, 478 S.W.3d 306, 328-29 (Ky. 2015)).[9] Therefore, the Kentucky Supreme Court invalidated the arbitration agreement because it was signed by a power of attorney and under those circumstances, "a power of attorney could not entitle a representative to enter into an arbitration agreement without specifically saying so," ibid.; or "only if the power of attorney 'expressly so provide[d].'" Ibid. (quoting Whisman, 478 S.W.3d at 329).

Although the "clear-statement rule," "singl[ed] out arbitration agreements," ibid. (quoting Whisman, 478 S.W.3d at 329), the Kentucky Supreme Court determined it passed FAA muster because "its rule would apply not just to those agreements, but also to some other contracts implicating 'fundamental constitutional rights.'" Ibid. (quoting Whisman, 478 S.W.3d at 328).

---

[9] In Kindred Nursing, the United States Supreme Court granted certiorari from Extendicare Homes, Inc. v. Whisman, 478 S.W.3d 306 (2015). Whisman consisted of three matters, consolidated for review before the Kentucky Supreme Court. Only Kindred Nursing and Clark participated in the appeal before the United States Supreme Court, hence the different titles. See Kindred Nursing, 581 U.S. at 249; Whisman, 478 S.W.3d. at 312.

A-3741-23

The United States Supreme Court held "[t]he Kentucky Supreme Court's clear-statement rule, . . . fail[ed] to put arbitration agreements on an equal plane with other contracts." Id. at 252. The Court noted, "[b]y the [Kentucky Supreme C]ourt's own account, that rule . . . serves to safeguard a person's 'right to access the courts and to trial by jury.'" Ibid. (quoting Whisman, 478 S.W.3d at 327).

Therefore, Kentucky's clear statement rule, "did exactly what Concepcion barred: adopt a legal rule hinging on the primary characteristic of an arbitration agreement—namely, a waiver of the right to go to court and receive a jury trial." Ibid. Thus, "[s]uch a rule is too tailor-made to arbitration agreements—subjecting them, by virtue of their defining trait, to uncommon barriers—to survive the FAA's edict against singling out those contracts for disfavored treatment." Ibid.

Further, the United States Supreme Court stated "the [Kentucky Supreme C]ourt's sometime-attempt to cast the rule in broader terms cannot salvage its decision." Id. at 253. The Court noted, "[n]o Kentucky court . . . has ever before demanded that a power of attorney explicitly confer authority to enter into contracts implicating constitutional guarantees." Ibid.

After our careful review of Kindred Nursing and New Jersey law, including Atalese, we conclude New Jersey's general contract rule, that requires

25

a waiver-of-rights provision be clear and unambiguous, does not run afoul of the FAA or Kindred Nursing. The rule "is [not] . . . tailor-made to arbitration agreements," id. at 252, nor does it "reveal . . . hostility to arbitration," id. at 254, or implicate the "arbitration-specific" concerns, ibid., raised in Kindred Nursing. Instead, as detailed by the New Jersey Supreme Court in Atalese, the rule has broad and general application to all contracts. Thus, Atalese fits neatly into Kindred Nursing.

Having concluded Atalese remains the law in New Jersey, we must consider whether the Arbitration Agreement here complied with its dictates. "No magical language is required to accomplish a waiver of rights in an arbitration agreement." Morgan v. Sanford Brown Inst., 225 N.J. 289, 309 (2016).

In Flanzman v. Jenny Craig, Inc., the New Jersey Supreme Court determined an arbitration agreement, "signed by plaintiff . . . and her . . . employer," met the "standard of Atalese." 244 N.J. 119, 124, 137 (2020). Among various references to arbitration, the agreement provided "[a]ny and all claims or controversies arising out of or relating to [e]mployee's employment, the termination thereof, or otherwise arising between [e]mployee and [c]ompany

shall, in lieu of a jury or other civil trial, be settled by final and binding arbitration." Id. at 126-27.

The Flanzman Court concluded, "[t]he [a]greement . . . clearly and unmistakably informs the parties that for '[a]ny and all claims or controversies arising out of or relating to [Flanzman's] employment, the termination thereof, or otherwise arising between' [the parties], 'final and binding arbitration' will take the place of 'a jury or other civil trial.'" Id. at 137-38 (third and fourth alterations in the original). The court determined "[a]lthough the [a]greement provide[d] only a general concept of the arbitration proceeding that would replace a judicial determination of Flanzman's claims, it ma[d]e[] clear that the contemplated arbitration would be very different from a court proceeding." Id. at 138.

Here, the Arbitration Agreement provides:

ARBITRATION

In the event of any dispute or disagreement, whether arising out of or relating to this Contract or otherwise, the Parties to the dispute shall use their best efforts to settle such disputes. "Parties" includes the General Agent, [AIL] the Company . . . and the State General Agent. To this effect, the Parties shall negotiate with each other in good faith to reach a just solution. The negotiation process is to be considered a settlement negotiation for the purpose of all state and federal rules

protecting statements made during such conferences from later discovery or use in evidence.

If the Parties do not reach a just solution by negotiation as described above, then upon written notice by one Party to another, all disputes, claims, questions and controversies of any kind or nature arising out of or relating to this Contract, any alleged violation of any state or federal statute, regulation, law or order of any kind, and/or the General Agent's relationship as an Independent contractor and not an employee (including, without limitation, claims for wrongful termination, discrimination, wage-and-hour violations, or any other claims based on an alleged employment relationship), regardless of whether they are brought by or against [AIL], the General Agent, or the State General Agent, except a dispute relating to the enforceability of this agreement to arbitrate, shall be submitted to binding arbitration under the substantive rules of the [FAA], to be administered by the American Arbitration Association ("AAA") in accordance with its Commercial Rules then in effect. The arbitration shall take place in the AAA office closest to the domicile of the General Agent. [AIL] shall pay any AAA filing, administrative, and arbitrator fee(s). Arbitration shall be on an individual, not a class, collective, representative, or private attorney general basis. If waiver as to class action claims is deemed unenforceable, the parties do not agree to class arbitration and any class action claims must proceed in court. If waiver as to collective, representative, or private attorney general claims is deemed unenforceable, any such claims must proceed in court, and must be stayed while any remaining claims are arbitrated on an individual basis. The arbitrator shall have the power to award any relief that would otherwise be available in court, including attorney's fees if permitted by statute, injunctive or other equitable

28

relief. The arbitrator's findings and award shall be final and binding on the Parties and their beneficiaries, successors, assigns, or anyone claiming an interest in the Contract. Any court having jurisdiction may enter judgment on the award rendered by the arbitrator(s). The parties acknowledge that this [c]ontract involves interstate commerce, and all issues relating to arbitration or the enforceability of this agreement to arbitrate shall be governed by the [FAA]. Aside from issues relating to arbitration or the enforceability of this agreement to arbitrate, all issues relating to any dispute, claim, or controversy arising out of or relating to this [c]ontract shall be governed by and decided in accordance with the internal laws of the State of Texas, without regard to its choice-of-law rules.

The Arbitration Agreement is similar to the agreement in Flanzman. However, the two agreements differ in one material respect, the Flanzman agreement provided "reasonable notice," see Atalese, 219 N.J. at 447, that the parties were waiving their rights to "jury or other civil trial." The Flanzman Court did not search for magic waiver words but instead, recognized "in lieu of a jury or other civil trial" was sufficient to notify the parties they were waiving those rights.

Here, unlike in Flanzman, the Agreement does not mention that arbitration was in lieu of a "jury or other civil trial" or provide any other indication that the parties waived their right to litigate in a courthouse. While Atalese does not

A-3741-23

require "magic words," here the absence of any explicit indication that the parties agreed to waive their rights renders their Arbitration Agreement invalid.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

30